[No. H011122. Sixth Dist. July 6, 1994.]

DALE SANDHU, Plaintiff and Appellant, v.
LOCKHEED MISSILES AND SPACE COMPANY, Defendant and
Respondent.

848

---

**COUNSEL**

William N. Woodson III and Thomas E. Kotoske for Plaintiff and Appellant.

Sheppard, Mullin, Richter & Hampton, John C. Cook, Daniel P. Westman, Paul H. Adams and Angela M. Nolan for Defendant and Respondent.

**OPINION**

ELIA, J.—The issue before this court is whether Dale Sandhu, an "East Indian" from Punjab, India, can sue under the Fair Employment and Housing Act for race-based employment discrimination. Lockheed argued successfully below that Sandhu was Caucasian and therefore could not bring suit on a race theory. We reject this narrow definition of race and hold that a cognizable claim for race discrimination may be brought on the basis of Sandhu's allegations. Since we also conclude Sandhu's failure to check the national origin box on his administrative charge form is an amendable defect, we will reverse.

### *Facts and Procedural Background*

Sandhu worked for Lockheed for eight years before it terminated his employment in 1990. In June 1991, Sandhu filed a charge of discrimination with the California Department of Fair Employment and Housing (DFEH) and the Equal Employment Opportunity Commission (EEOC). On the charge form, Sandhu checked "race" and "age" as the causes of discrimination, and stated his belief that "I have been discriminated against because of my age (48) and race (Asian)." He alleged he had been laid off despite the fact that "my performance was as good as or better than similarly situated non-Asians who were retained," and that he "was better qualified than the younger, non-Asian individuals" who were selected for positions for which he applied posttermination.

In November 1991, DFEH issued Sandhu a "right to sue" letter.

On January 29, 1992, Sandhu filed a complaint in Santa Clara County Superior Court,[1] alleging that he had been "treated differentially and was thereby denied salary increases, promotions, given false performance evaluations, training, educational opportunities and transfers on account of plaintiff's race and/or national origin." The complaint described Sandhu as "East Indian."

Sandhu filed a first amended complaint on April 13, 1992. In this, as in his second and third amended complaints, Sandhu described himself as "East Indian." On August 10, 1992, the trial court sustained Lockheed's demurrer to Sandhu's first amended complaint with leave to amend. On December 1, 1992, Lockheed demurred to the third amended complaint, arguing that Sandhu was from India and because he was Caucasian, could not allege discrimination based on race.

---

[1] In his civil action, Sandhu did not state a cause of action based on age discrimination.

On January 12, 1993, the trial court held a hearing on Lockheed's demurrer. The court concluded that "by definition, [Sandhu] is Caucasian," and that it was "under the impression that in an action under FEHA a person who is in fact Caucasian may not complain of race." Accordingly, the trial court overruled the demurrer, but ordered "[a]ll references to 'race' . . . [stricken] from the complaint without leave to amend," and allowed Sandhu 20 days to file an amended complaint.

Three days later, Lockheed produced a "personnel" document which classified Sandhu's race as Asian.[2] Sandhu's counsel brought this document to the trial court's attention and asked it to reconsider its ruling. It apparently declined to do so.

On January 15, 1993, Sandhu filed his fourth amended complaint, alleging that he was "an East Indian male whose national origin is Punjab, India . . . . This action is brought pursuant to [FEHA] based on national origin discrimination." Once again, Lockheed filed a demurrer, arguing that Sandhu's failure to allege discrimination on the basis of national origin in his administrative charge was a jurisdictional prerequisite to his pursuit of a civil action. The trial court agreed, and on March 10, 1993, sustained Lockheed's demurrer without leave to amend and ordered a judgment of dismissal to be entered in its favor. Notice of entry of judgment was served on March 25, 1993. On April 2, 1993, Sandhu filed his notice of appeal.

## Discussion

In *First Nationwide Savings* v. *Perry* (1992) 11 Cal.App.4th 1657, 1662 [15 Cal.Rptr.2d 173], we summarized the standard of review applicable to an appeal from an order sustaining a demurrer: "In examining the sufficiency of the complaint, '[w]e treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. . . . We also consider matters which may be judicially noticed.' . . . 'When a demurrer is sustained, we determine whether the complaint states facts sufficient to constitute a cause of action. . . . And when [a demurrer] is sustained without leave to amend, we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm. . . . The burden of proving such a reasonable possibility is squarely on the plaintiff.'" (Citations omitted.)

---

[2]Lockheed states in its brief that Sandhu "identified himself" as Asian in this document. Nothing in the record either verifies or disproves this contention.

We proceed to examine the issues in light of this standard.

I

■ In support of its demurrer to Sandhu's third amended complaint, Lockheed argued "Plaintiff is from India. He is Caucasian. He cannot claim he was discriminated against because of his *race*." The trial court agreed. On appeal, Lockheed urges this court to uphold the trial court's conclusion, citing to the "common popular understanding that there are three major human races—Caucasoid, Mongoloid, and Negroid." (*Saint Francis College v. Al-Khazraji* (1987) 481 U.S. 604, 610, fn. 4 [95 L.Ed.2d 582, 590, 107 S.Ct. 2022].) As we shall see, the lack of a common understanding of how to define race, which the Supreme Court acknowledged in *Saint Francis*, defeats Lockheed's claim. But first we will examine the statutory and case law context in which this issue arises.

The California Fair Employment Practices Act (FEPA) was enacted in 1959 and recodified in 1980 as part of the Fair Employment and Housing Act (FEHA). (Stats. 1980, ch. 992, § 4, p. 3140; Gov. Code, § 12900 et seq.) It prohibits job discrimination on specified grounds, including race and national origin. (Gov. Code, § 12921.)

Victims of discrimination file complaints with DFEH (Gov. Code, § 12960) which must promptly investigate (Gov. Code, § 12963). If DFEH determines a claim is valid, it tries to resolve the matter through "conference, conciliation, and persuasion." (Gov. Code, § 12963.7.) Failing this, DFEH must give complainant a right-to-sue letter, which allows him or her to proceed with a civil suit. (Gov. Code, § 12965, subd. (b)).

■ FEHA has its federal counterpart in title VII of the Federal Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.). Since the antidiscrimination objectives and public policy purposes of the two laws are the same, we may rely on federal decisions to interpret analogous parts of the state statute. (*Clark* v. *Claremont University Center* (1992) 6 Cal.App.4th 639, 662 [8 Cal.Rptr.2d 151]; *Mixon* v. *Fair Employment & Housing Com.* (1987) 192 Cal.App.3d 1306, 1316 [237 Cal.Rptr. 884]; Cal. Code Regs., tit. 2, § 7285.1.)

Related to, but not coextensive with title VII is section 1981 of the Civil Rights Act of 1866 (42 U.S.C. § 1981) which provides that "[a]ll persons . . . shall have the same right . . . to make and enforce contracts, . . . as is enjoyed by white citizens." Section 1981 has been construed as forbidding any racial discrimination in employment. (See, e.g., *Von Zuckerstein* v. *Argonne Nat. Laboratory* (7th Cir. 1993) 984 F.2d 1467, 1471.)

While title VII may enjoy a broader sweep, section 1981 presents greater opportunities for damage awards. (See, e.g., *Johnson* v. *Railway Express Agency* (1975) 421 U.S. 454, 460 [44 L.Ed.2d 295, 301-302, 95 S.Ct. 1716].) Perhaps for this reason, plaintiffs suing under federal law have been anxious to have their claims construed as race discrimination. Federal courts were therefore faced with plaintiffs from various ethnic groups, particularly Mexican-Americans, Hispanics, or those with Spanish surnames, who did not fit into neat racial categories, and whose claims were arguably based on national origin or ethnicity, not covered by section 1981, rather than on race. This led to a lengthy debate in the federal courts concerning the difference between racial discrimination and discrimination based on national origin or ethnicity. Because the genesis and the resolution of this debate are directly relevant to the issue before us, we shall review it.

The debate was summarized in *Ortiz* v. *Bank of America* (E.D.Cal. 1982) 547 F.Supp. 550. Plaintiff Ortiz, a woman of Puerto Rican descent, alleged she was denied promotions and terminated from her employment because of her "national origin and accent." (*Id.* at p. 552.) Defendants moved to dismiss on the grounds that she had failed to state a cause of action under section 1981, i.e. that her claim was not one of racial discrimination.

*Ortiz* identified three different approaches which had been taken by other federal courts confronted with this issue.[3] First, some courts had simply concluded that section 1981 did not provide a remedy for national origin discrimination. These cases[4] mostly involved plaintiffs who were not members "of a racial group distinct from 'whites,'" and because "'whites' may not claim discrimination by other 'whites,'" these courts concluded plaintiffs were attempting to allege national origin discrimination. (547 F.Supp. at p. 560.) *Ortiz* noted that none of the courts in this group of cases had attempted to define "race."

Second, some courts had allowed "Hispanic plaintiffs and those of other ethnic groups" to state a claim under section 1981, but required them to

---

[3]The *Ortiz* court was aware that several Ninth Circuit cases had allowed "Hispanics or plaintiffs of other national origins" to state claims under United States Code section 1981.

[4]*Hiduchenko* v. *Minneapolis Medical & Diagnostic Ctr.* (D.Minn. 1979) 467 F.Supp. 103, 106 (Ukranian descent); *Vera* v. *Bethlehem Steel Corp.*(M.D.Pa. 1978) 448 F.Supp. 610, 613 (Puerto Rican); *Jones* v. *United Gas Improvement Corp.* (E.D.Pa. 1975) 68 F.R.D. 1, 10-15 (Spanish surname); *Avigliano* v. *Sumitomo Shoji America, Inc.* (S.D.N.Y. 1979) 473 F.Supp. 506, 513-514 (non-Japanese).

prove that the alleged discrimination was racial, rather than based on national origin. (547 F.Supp. at p. 561.) The courts in these cases[5] "recognize[d] some difficulty in, if not the futility of, attempting to distinguish between discrimination on the basis of race and on the basis of national origin," but nonetheless recognized the distinction. (547 F.Supp. at p. 561.)

The third category of cases[6] "recognized the difficulty, if not the impossibility, of defining the term 'race' as distinguished from 'national origin,' " and determined whether a claim was cognizable by looking at whether the plaintiff was "a member of a group that is perceived to be distinguishable from 'white citizens.' " (547 F.Supp. at p. 564.) In *Manzanares* v. *Safeway Stores, Inc., supra,* 593 F.2d 968, 970-972, the leading case in this group, the Tenth Circuit rejected the argument that section 1981 could be limited to a technical or restrictive meaning of race, stating: "It is sufficient . . . that . . . a prejudice as alleged in this complaint does exist. It is directed against persons with Spanish surnames. It is a group whose rights can be measured against the standard group or control group referred to in section 1981." (*Id.* at p. 972.)

Agreeing that "[t]he use of racial classifications or distinctions in political or judicial functions is fraught with peril" (*LaFore* v. *Emblem Tape & Label Co.* (D.Colo. 1978) 448 F.Supp. 824, 826), *Ortiz* went on to examine the difficulty of adopting any meaningful racial classifications, noting that the definition depends on the purpose of the classification (*id.* at p. 565, citing S. Molnar, Races, Types & Ethnic Groups (1975), p. 13), and that the "notion of race is dynamic" rather than static. (547 F.Supp. at p. 567.)

*Ortiz* concluded, as had other courts in the third group, that a plaintiff's section 1981 claim was cognizable where he or she alleged discrimination

---

[5]*Khawaja* v. *Wyatt* (W.D.N.Y. 1980) 494 F.Supp. 302, 304-305 (Pakistani); *Saad* v. *Burns Intern. Sec. Services, Inc.* (D.D.C. 1978) 456 F.Supp. 33, 37 (Arabian descent); *Apodaca* v. *General Elec. Co.* (D.N.M. 1978) 445 F.Supp. 821, 823-824 (Spanish surname); *Martinez* v. *Hazelton Research Animals, Inc.* (D.Md. 1977) 430 F.Supp. 186, 188 (Hispanic); *Gomez* v. *Pima County* (D.Ariz. 1976) 426 F.Supp. 816, 819 (Mexican-Americans); *Cubas* v. *Rapid American Corp., Inc.* (E.D.Pa. 1976) 420 F.Supp. 663, 665-666 (Cuban-American); *Bullard* v. *OMI Georgia, Inc.* (5th Cir. 1981) 640 F.2d. 632, 634 (Black and White v. "oriental").

[6]*Manzanares* v. *Safeway Stores, Inc.* (10th Cir. 1979) 593 F.2d 968 (Mexican-American descent); *Madrigal* v. *Certainteed Corp.* (W.D. Mo. 1981) 508 F.Supp. 310, 311 (Mexican-American); *Whatley* v. *Skaggs Companies, Inc.* (D.Colo. 1980) 502 F.Supp. 370, 376 (Mexican-American descent); *Aponte* v. *National Steel Service Ctr.* (N.D.Ill. 1980) 500 F.Supp. 198, 202-203 (Hispanic); *Tayyari* v. *New Mexico State University* (D.N.M. 1980) 495 F.Supp. 1365, 1369-1370 (Iranian); *Garcia* v. *Rush-Presbyterian-St.Luke's Medical Ctr.* (N.D.Ill. 1978) 80 F.R.D. 254, 262-264 (Mexican and Mexican-American); *Ortega* v. *Merit Insurance Co.* (N.D.Ill. 1977) 433 F.Supp., 135, 139 (Hispanic origin); *Enriquez* v. *Honeywell, Inc.* (W.D. Okla. 1977) 431 F.Supp. 901 (Blacks and Spanish surnames); *Budinsky* v. *Corning Glass Works* (W.D.Pa. 1977) 425 F.Supp. 786, 788 (Slavic). See also *Banker* v. *Time Chemical, Inc.* (N.D. Ill. 1983) 579 F.Supp. 1183 (East Indian ancestry).

"on the basis of membership in a group composed of both men and women, the boundaries of which are not fixed by age or exclusively by religious faith, and which is of a character that is or may be perceived as distinct when measured against the group which enjoys the broadest rights." (547 F.Supp. at p. 568.)

The rationale embraced in *Ortiz* was echoed In *Baruah* v. *Young* (D.Md. 1982) 536 F.Supp. 356, decided in the same year. There, plaintiff, a native of India and a nontenured associate professor at the University of Maryland, filed an administrative charge under title VII after the school hired a "white American national" for his position, alleging employment discrimination based on national origin and age. When he filed suit, plaintiff apparently added allegations of racial discrimination, and defendants moved to dismiss on the grounds that his complaint sounded not in race but in national origin and age, as identified in plaintiff's administrative charge. The district court rejected this argument. Because Baruah's characteristics, "non-white and a native of India [fn. omitted], may entitle him to recover upon proof of discrimination on either [race or national origin]," the court denied the motion to dismiss. (*Id.* at p. 362.)

Four years later, the Third Circuit endorsed *Ortiz*'s reasoning in *Al-Khazraji* v. *Saint Francis College* (3d Cir. 1986) 784 F.2d 505. Al-Khazraji, a native of Iraq and a Muslim, sued St. Francis College for employment discrimination under title VII, section 1981 and state law. Saint Francis advanced an argument in support of its attempt to dismiss the section 1981 claim which is indistinguishable from that used by Lockheed in this case; that "an ethnic Arab is taxonomically a Caucasian and therefore 'not a protected person under Section 1981 when he is presumably claiming other Caucasians or whites were improperly favored over him.' " (*Id.* at p. 514.) Noting that section 1981's protections were not limited to non-Whites (*McDonald* v. *Santa Fe Trail Transp. Co.* (1976) 427 U.S. 273 [49 L.Ed.2d 493, 96 S.Ct. 2574)) and that "there is no precise definition of [race]" (*Al-Khazraji, supra,* at p. 516), the Third Circuit held that the purpose of United States Code section 1981 was "to ensure that all persons be treated equally, without regard to color or race, which we understand to embrace, at the least, membership in a group that is ethnically and physiognomically distinctive." (784 F.2d at p. 517.) The court declared itself "unwilling to assert that Arabs cannot be the victims of racial prejudice: 'prejudice is as irrational as is the selection of groups against whom it is directed.' " (*Ibid.,* quoting *Manzanares* v. *Safeway Stores, Inc., supra,* 593 F.2d at p. 971.)

This debate was ultimately settled when the United States Supreme Court endorsed both the result and the rationale of this decision in *Saint Francis*

*College* v. *Al-Khazraji, supra,* 481 U.S. 604 in 1987. Citing many of the same sources as *Ortiz* (see *Ortiz* v. *Bank of America, supra* 547 F.Supp. at pp. 560-565, fns. 18, 19 and 22), Justice White, writing for a unanimous court, first noted that the tripartite division of humanity into three races—a division cited with such authority by Lockheed—had been criticized as arbitrary by anthropologists and biologists, and that some scientists had concluded that ". . . racial classifications are for the most part sociopolitical, rather than biological, in nature." (*Saint Francis College, supra,* at p. 610, fn. 4 [95 L.Ed.2d at p. 590].) He then reflected that in the 19th century, when section 1981 was enacted, the definition of race had been broader than that employed currently, and included various ethnic groups (such as Swedes, Germans, and English) who would not now be considered races.

Based on the history of the statute, Justice White concluded that ". . . Congress intended to protect from discrimination identifiable classes of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics. . . . whether or not it would be classified as racial in terms of modern scientific theory." (481 U.S. at p. 613 [95 L.Ed.2d at p. 592].) He then upheld the Third Circuit's conclusion that section 1981's reach extended to an individual who is part of an " 'ethnically and physiognomically distinctive subgrouping of *homo sapiens,*' " with the caveat that "a distinctive physiognomy is not essential" to qualify for its protection. (*Ibid.*) If Mr. Al-Khazraji could prove that he was discriminated against "based on the fact that he was born an Arab, rather than solely on the place or nation of his origin, or his religion" (*ibid.*), the court concluded, he would have made out a case under the statute.[7]

*Saint Francis* thus ended over 15 years of debate in the federal courts over the definition of race discrimination under United States Code section 1981. In light of the context of this debate, we are confident it provides the basis for the result in this case. Lockheed's attempt to minimize the significance of *Saint Francis* on the basis of the difference between title VII and section 1981 is unavailing. It has not cited, and we have not found, any authority for the proposition that racial discrimination under title VII should be more narrowly defined than under section 1981. Since the two statutes embrace " 'parallel or overlapping remedies against discrimination,' " (*Davis* v. *County of Los Angeles* (9th Cir. 1977) 566 F.2d 1334, 1340), have identical purposes (*Walker* v. *Blue Cross of California* (1992) 4

---

[7]In his concurring opinion, Justice Brennan noted that there was no bright line distinction between discrimination based on ancestry or ethnicity and that based on place or national origin. Since they overlap under title VII (see 29 C.F.R. § 1606.1 (1986)), he read the court's opinion only to hold that no cognizable section 1981 claim could be based on birthplace alone. (481 U.S. at p. 614 [95 L.Ed.2d at p. 592].)

Cal.App.4th 985, 997-998 [6 Cal.Rptr.2d 184]; *Rodriguez* v. *United Airlines, Inc.* (N.D.Cal. 1992) 812 F.Supp. 1022, 1027), and contain "analogous principles, standards, and theories of discrimination" (*Mister* v. *Illinois Cent. Gulf R. Co.* (S.D.Ill. 1986) 639 F.Supp. 1560, 1564) we fail to perceive any legally significant distinction justifying a definition of racial discrimination under title VII different from that under section 1981.

Lockheed's reliance on *Malhotra* v. *Cotter & Co.* (7th Cir. 1989) 885 F.2d 1305, the only case it cites in support of this position, is misplaced. There, plaintiff, "of Indian birth and ancestry," brought suit under both title VII and United States Code section 1981 for "ethnic discrimination." (*Id.* at p. 1308.) Lockheed cites the following language as dispositive: "Although the parties describe the charge as one of racial discrimination, it is more accurately described as a charge of discrimination based on color, ethnicity, or national origin, rather than on race, since Indians are Caucasians." (*Ibid.*) The Seventh Circuit recognized, however, that "the precise characterization makes no difference in this case," since section 1981 protects " 'nonwhites' even when technically they are Caucasians" and that "Title VII groups discrimination on grounds of race with discrimination on grounds of color; although Indians are Caucasians, they are generally of darker skin color than 'white' Americans." (*Ibid.*) *Malhotra* thus acknowledged *Saint Francis's* holding that race discrimination under United States Code section 1981 can be based on physiognomic differences, and concluded, in addition, that because Indians were perceived to be "non-white," Malhotra could make out a cognizable race discrimination claim under title VII.

Lockheed also argues that Sandhu could not state a claim for racial discrimination because title VII, enacted in 1959, and FEHA, enacted in 1964, intended to employ the "modern Twentieth Century definition" of race under which Sandhu is a Caucasian. Its reliance on *Saint Francis* for this proposition is misplaced. By rejecting the argument that "scientific" racial classifications could be used to defeat a plaintiff's section 1981 claim, the Supreme Court in *Saint Francis* upheld the reasoning of *Ortiz* and other federal cases which had found distinctions between racial and national origin discrimination both unworkable and unsound.

*Saint Francis* found a substantial lack of uniformity in the "modern" definition of race. (See 481 U.S. at pp. 610-611, and fn. 4 [95 L.Ed.2d at pp. 589-590].) Current dictionary and encyclopedic definitions reflect the same lack of unanimity. Webster's Ninth New Collegiate Dictionary (1990) defines race to include, inter alia, "a family, tribe, people, or nation belonging to the same stock," and "a class or kind of people unified by community of

interests, habits or characteristics"; the Encyclopaedia Britannica divides people into six to ten "geographical races" (9 The New Encyclopaedia Britannica Micropaedia Ready Reference (1993) p. 876); the World Book divides them into nine geographical races including "Indian" (16 World Book (1991) p. 55); and the Encyclopaedia Americana identifies six major races, including "Races of the Indian Subcontinent" (23 Encyclopaedia Americana (1987), pp. 116-118). The "modern definition" of race thus appears as equivocal now as it did to the Supreme Court in 1987.

A review of census data also reflects how the pragmatic definition of race has evolved historically. Until 1810, the Bureau of the Census only recorded the White population. From 1810 to 1850, it recorded White and "negro." From 1860-1970 it recorded White, Negro and "other races," including Indian (Native American), Japanese and Chinese. (Historical Statistics of the U.S., Colonial Times to 1970, pt. 1, U.S. Dept. of Commerce, Bur. of the Census (1970) Table 91-104, p. 14.) By 1950, the census had broken down the "nonwhite population" into 9 racial categories, including "Asian Indians" (Statistical Abstract of the U.S. (1960) p. 28, chart 25, fn. 1), whereas "[p]ersons of Mexican birth or ancestry who are not definitely [Native American] Indian or of other nonwhite stock" were included in the White population. (*Id.* at p. 2.) The 1980 census identified 15 racial groups, including "Asian Indian." (Statistical Abstract of the U.S. (1990) p. 4.) The Bureau of the Census notes that its use of "race" "does not denote any clear cut scientific definition of biological stock. . . ." (*Ibid.*; Statistical Abstract of the U.S., *supra*, at p. 2.)

Discriminators, as *Manzanares* put it, may indeed be "poor anthropologists" (593 F.2d at p. 971); any scientific definition of race has little to do with the realities of racial discrimination. Sandhu alleged both in his administrative charge and in his complaints that he was treated differently from other, "non-Asian" Lockheed employees. Like other plaintiffs whose ancestry, descent and national origin are all intimately related, (cf. *Garcia* v. *Rush-Presbyterian-St. Luke's Medical Ctr.*, *supra*, 80 F.R.D. 254; *Banker* v. *Time Chemical Inc.*, *supra*, 579 F.Supp. at p. 1187) Sandhu may not and need not be aware of the precise basis of Lockheed's disparate treatment of him: whether it was his accent, his skin color, his ancestry or his nationality. We conclude that Sandhu's allegation that he was subject to a discriminatory animus based on his membership in a group which is perceived as distinct when measured against other Lockheed employees, and which is not based on his birthplace alone, is sufficient to make out a cognizable claim for racial discrimination under FEHA.

The unassailable logic of this conclusion is apparent when we examine the converse. As the Third Circuit recognized in *Al-Khazraji*, adhering to a strict tripartite definition of race would produce "anomalous results: while a white would be able to claim anti-white discrimination under the statute, . . . a Mexican-American or an Indian would be unable to make out a claim, unless they contended they were unfairly treated by virtue of being Caucasians." (784 F.2d at p. 520 (Adams, J. conc.).)

We conclude Sandhu's description of himself as East Indian does not preclude his bringing a race discrimination claim under FEHA, and that the trial court abused its discretion in ordering all references to race stricken from his third amended complaint. (*First Nationwide Savings* v. *Perry, supra,* 11 Cal.App.4th 1657.)

## II

■ In each of Sandhu's complaints, he alleged discrimination based on "race and/or national origin." After the trial court ordered all references to race stricken from Sandhu's third amended complaint, Lockheed demurred to his fourth amended complaint on the grounds that he had not included a national origin allegation in his administrative charge, and had thus failed to exhaust his administrative remedies. The trial court agreed, and dismissed the complaint. Sandhu argues on appeal that his failure to check the "national origin" box on the administrative charge form should not preclude him from bringing suit on this ground. We agree.

In *Sanchez* v. *Standard Brands, Inc.* (5th Cir. 1970) 431 F.2d 455, the seminal case on this issue, plaintiff filed an administrative charge based on sex discrimination and an amended charge alleging discrimination based on sex and national origin. Her complaint, however, alleged discrimination based on race and color. (*Id.* at p. 459.) The district court dismissed on exhaustion grounds, and the Fifth Circuit reversed.

A plaintiff, the court noted, might not be aware of the motivation for an employer's discriminatory conduct, and title VII, a remedial statute, had procedures designed for the unschooled, not for the "sophisticated [and] the cognoscenti." (431 F.2d at p. 463.) *Sanchez* also noted that the purpose of a charge of discrimination is to "trigger the investigatory and conciliatory procedures of the EEOC" (*id.* at p. 466), and thus its "crucial element . . . is the *factual* statement contained therein. . . . The selection of the type of

discrimination alleged, i.e. the selection of which box to check, is in reality nothing more than the attachment of a legal conclusion to the facts alleged." (*Id.* at p. 462, italics in original.) Checking the wrong box, therefore, was a mere "technical defect." (*Ibid.*) Neither was the judicial complaint "beyond the scope" of the charges plaintiff filed with the EEOC, since its scope "is limited to the 'scope' of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." (*Id.* at p. 466; accord, *Oubichon* v. *North American Rockwell Corporation* (9th Cir. 1973) 482 F.2d 569, 571.)

Both California courts and those from other jurisdictions have endorsed the "like or reasonably related" standard articulated in *Oubichon,* recognizing that to do otherwise would create a "needless procedural barrier" (*id.* at p. 571) to enforcement of FEHA. (Cf. *Jones* v. *Los Angeles Community College Dist.* (1988) 198 Cal.App.3d 794, 810 [244 Cal.Rptr. 37]; *Baker* v. *Children's Hospital Medical Center* (1989) 209 Cal.App.3d 1057, 1064 [257 Cal.Rptr. 768]; *Van Pool* v. *City and County of San Francisco* (N.D.Cal. 1990) 752 F.Supp. 915, 924; *Albano* v. *Schering-Plough Corp.* (9th Cir. 1990) 912 F.2d 384, 386-388; see also *Kahn* v. *Pepsi Cola Bottling Group* (E.D.N.Y. 1981) 526 F.Supp. 1268.)

We are not persuaded by Lockheed's argument that a contrary result is mandated by *Shah* v. *Mt. Zion Hospital & Medical Ctr.* (9th Cir. 1981) 642 F.2d 268. Using the "like or reasonably related" standard, *Shah* dismissed the race, religion, and color allegations in plaintiff's complaint, as not sufficiently close to the sex and national origin claims in his administrative charge to have been investigated by the EEOC. (*Shah, supra,* at pp. 271-272.) Here, by contrast, we are confident that the administrative investigation into Sandhu's claim of disparate treatment because he was "Asian" would likely have encompassed both race and national origin.

We thus conclude Sandhu's failure to check the "national origin" box on his administrative charge was an amendable defect which does not preclude his bringing suit on this theory, and that the trial court abused its discretion in sustaining Lockheed's demurrer to his fourth amended complaint without leave to amend. By so holding, we do not reach the merits of Sandhu's discrimination claim. By removing the "technical barricades barring [his] entry," we simply hold that he is "entitled to get into the courthouse in the first place." (*Sanchez* v. *Standard Brands, Inc., supra,* 431 F.2d at p. 467.)

*Disposition*

The judgment is reversed. The cause is remanded with directions to overrule the demurrer to the fourth amended complaint and to reinstate the third amended complaint. Costs to appellant.

Cottle, P. J., and Bamattre-Manoukian, J., concurred.