[No. A125927. First Dist., Div. One. July 9, 2010.]

DAVID B. REEVES, Plaintiff and Appellant, v.
MV TRANSPORTATION, INC., Defendant and Respondent.

668

COUNSEL

Bradley & Pedersen and Edwin Bradley for Plaintiff and Appellant.

Lafayette & Kumagai, Gary T. Lafayette, Eric Dewalt and Namal Munaweera for Defendant and Respondent.

OPINION

**MARCHIANO, J.**—Plaintiff David B. Reeves, age 56, applied for a position as a staff attorney with defendant MV Transportation, Inc. He was not one of the people chosen to be interviewed, and the job was given to someone 40 years old. He sued defendant for age discrimination, and the court granted defendant's motion for summary judgment. Plaintiff contends that there are triable issues arising from his superior qualifications for the position, defendant's inconsistent explanations for not hiring him, and defendant's spoliation of evidence. We disagree and affirm the judgment for defendant.

## I. BACKGROUND

Defendant's general counsel and chief legal officer John Biard posted a notice on the Association of Corporate Counsel Web site in January 2005 of a staff attorney opening with defendant. The notice read: "National public transportation company, with its corporate offices in Fairfield, California seeks an experienced attorney in traditional labor law and employment litigation to report to the General Counsel/Chief Legal Officer. [¶] We offer an excellent opportunity to join a growing Legal Department and to work with Operations[] and Human Resources as a productive member of the Corporate Office. [¶] . . . [¶] Requirements: Qualified candidates should demonstrate substantial experience representing management in labor/management issues; practice before the NLRB; grievance and arbitration under CBAs; collective bargaining and/or counseling of clients with CBA/labor dispute issues, and proven employment litigation experience, including responding to administrative agency civil rights actions (EEOC,

etc.). . . ." Gail Blanchard-Saiger, who was hired, and plaintiff were among approximately 60 people who applied for the position.

Ms. Blanchard-Saiger's resume showed that she graduated from college in 1986, and worked four years as a company human resources manager, where, among other things, she revised and implemented personnel policies and assisted with the negotiation of the company's first union contract. She then went to law school at the University of California, Davis, where she graduated in the top 5 percent of her class and as a member of the Order of the Coif. She became a member of the New York and California bar associations, and clerked three years for a judge of the United States District Court for the Eastern District of California. She joined the law firm of Foley & Lardner in 1997, and was working there as a senior counsel in labor and employment litigation when she applied for the position with defendant. In her practice she had been called upon to: "[c]ounsel employers regarding all aspects of labor and employment law"; "[m]anage all phases of labor and employment/commercial litigation in state and federal courts"; "[r]epresent employers before state and federal administrative agencies"; "[r]epresent management in labor grievance and arbitration proceedings"; and "[d]evelop and conduct labor and employment law training for clients."

Plaintiff's resume began with the following paragraph under the heading "Senior Labor and Employment Attorney": "Highly qualified professional experienced in all areas of the labor and employment law filed in major corporate setting. Represented clients in over 350 labor arbitrations and before NLRB, EEOC, DFEH, OFCCP, Cal-OSHA, and Division of Labor Standards Enforcement. Advised on a daily basis regarding contract negotiations, contract administration, personnel decisions, and effect of state and federal law. Represented clients in union litigation, wage-hour class action, employment discrimination and wrongful termination litigation. Juris Doctor, UCLA School of Law; member, California State Bar." The resume then detailed plaintiff's professional experience, beginning with work as a field attorney for the National Labor Relations Board (NLRB) from 1973 to 1975. He worked for Kaiser Industries and Kaiser Steel Corporation from 1975 to 1985, where, among other things, he had "[s]erved as management representative in final stage of grievance procedure," and "[s]uccessfully represented Company in $18 million arbitration involving issue of Supplemental Unemployment Benefit Plan continuance post-contract expiration." As an attorney at Sempra Energy, a "[n]ational energy provider with 12,000 employees," from 1985 to 2002 he had, among other things, "[g]uided . . . Sempra's largest subsidiary . . . through difficult and contentious collective bargaining negotiations"; "[s]uccessfully defended 'pay-per-route' method of compensation for meter readers against challenges by federal class action and state agency, thereby generating millions in annual savings"; "[o]btained state appellate court decision preempting most of Company's operations from

reach of Cal-OSHA"; and "[p]rovided preventative law advice to client on daily and proactive basis, including downsizings." Plaintiff resumed work as an NLRB field attorney in 2003, and was holding that job when he applied for defendant's position.

The job posting asked that cover letters and resumes be e-mailed to Biard at his e-mail address with defendant. Plaintiff sent his resume to Biard on January 21, 2005, with a cover e-mail stating, "I have extensive experience in NLRB matters, arbitration, collective bargaining negotiations, wage-hour, employment discrimination litigation, OSHA, and various other state and federal labor law matters." The e-mail was sent at 9:28 a.m. from plaintiff's e-mail address at the NLRB. Biard testified at his deposition that he was put off to receive an e-mail from a taxpayer-supported government office during working hours, and that he did not permit employees he supervised to use defendant's workplace to look for jobs outside the company. Plaintiff testified in his deposition that he telephoned Biard on February 9, 2005, to confirm that Biard had received his resume and to reiterate his interest in the position. He testified that Biard did not promise him an interview and gave him no reason to believe that he would receive one. Biard told him that he had just finished receiving applications, and would be scheduling interviews in two to three weeks.

Biard testified that he was the only one who reviewed resumes for the position, and that he alone decided who would be interviewed. He put a checkmark on the resumes of the people selected for interviews, and an "X" on those he rejected. He did not mark plaintiff's resume, which meant that plaintiff had a "possibility" of being hired, and would not be among "the last people looked at." Biard did not recall precisely how many people he interviewed; he said he had conducted "maybe four interviews," and had two others pending, when he interviewed Blanchard-Saiger.

Biard chose Blanchard-Saiger for an interview in part because she had been recommended by Pat Riley, an attorney Biard knew and respected who was of counsel at the Foley firm. Riley had not worked with Blanchard-Saiger, but he knew that she was applying for defendant's position, and he told Biard that she was leaving the firm voluntarily and had not been asked to leave. Biard liked Blanchard-Saiger's law firm experience; he testified, "I came up through the ranks working for private law firms. And . . . right or wrong, I think that I earned my stripes that way, billing, you know, 21-, 2400 hours, et cetera." He was impressed by Blanchard-Saiger's "academic credentials," including her federal judicial clerkship. Her New York bar membership "was a big positive" in view of defendant's operations there. Her human resources background, useful in dealing with regulatory matters, was an added plus he did not expect to find in candidates for the position.

When Biard was asked in his deposition about any negative impressions he formed about plaintiff from plaintiff's resume and communications, he said that plaintiff had (1) used time and resources at work to apply for the job; (2) sent him an e-mail he regarded as arrogant; (3) not highlighted litigation experience on his resume; and (4) not worked for a law firm. Biard found the e-mail plaintiff sent following up on his employment application to be arrogant insofar as it stated: "Frankly, I doubt that any other candidate could be as qualified and experienced for this position as I am. I doubt that any other candidate meets your stated requirements for the position as closely as I do." However, when Biard was shown the e-mail and saw that it was sent on March 24, 2005, he realized that it could not have borne on his hiring decision because he had already extended the offer to Blanchard-Saiger by that point. He went on at the deposition to acknowledge that plaintiff was qualified for the position, and that none of the four negatives identified above were reasons why he did not interview plaintiff.

Biard did not interview plaintiff because he "found precisely the candidate [he] was looking for" when he interviewed Blanchard-Saiger. After interviewing Blanchard-Saiger, Biard did not proceed with the other interviews he had pending. He received "a number of resumes . . . where those persons on paper had the requisite qualifications," and he did not have time to interview all of them. "[P]ersonality wise," he and Blanchard-Saiger "just clicked, end of story. I thought she was the person I wanted. . . . I didn't have the time to . . . continue to interview people and to look over resumes."[1]

Biard said that "the only thing negative at all" about Blanchard-Saiger "was her desire not to do litigation in the long term." Blanchard-Saiger testified in her deposition that "when I was applying for the job, I made it clear that I did not want to do civil litigation. I did that for however many years at Foley, and I did not want to do civil litigation anymore." Biard said that he told Blanchard-Saiger during her interview that, at least immediately after being hired, she would be working on some litigation matters. "She knew that would be the case if she accepted the position, and did do so."

Biard did not extend Blanchard-Saiger an offer at her interview, but stopped interviewing for the position after meeting her. The job notice listed a salary range of $130,000 to $140,000, but defendant agreed to pay Blanchard-Saiger $160,000.

Biard asserted that "my reasons for not hiring [plaintiff] had nothing to do with discrimination." Plaintiff conceded in his deposition that he had no

---

[1] Plaintiff asserts that Biard "did not close the selection process" after interviewing Blanchard-Saiger. While this is true in the sense that Biard did not offer Blanchard-Saiger a position during her interview, the testimony plaintiff cites does not establish that he interviewed any new candidates thereafter.

direct evidence that he was not hired because of his age or that Biard harbored any group bias. Biard hired another attorney, Joan Saupe, who, like Blanchard-Saiger, began working for defendant in April 2005. Ms. Saupe was 49 years old when defendant retained her.

Plaintiff lodged a charge of age discrimination against defendant with the Department of Fair Employment and Housing (DFEH), alleging that he was not selected for an interview and not hired for the staff attorney position because he was 56 years old when the hiring decision was made. Plaintiff received a right-to-sue letter, and filed a complaint against defendant for age discrimination in violation of the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.). He appeals from the judgment entered after defendant's motion for summary judgment was granted.

## II. DISCUSSION

### A. *Scope of Review*

"The rules of review are well established. If no triable issue as to any material fact exists, the defendant is entitled to a judgment as a matter of law. [Citations.] In ruling on the motion, the court must view the evidence in the light most favorable to the opposing party. [Citation.] We review the record and the determination of the trial court de novo. [Citations.]" (*Shin v. Ahn* (2007) 42 Cal.4th 482, 499 [64 Cal.Rptr.3d 803, 165 P.3d 581].)

### B. *Discrimination*

■ To establish a prima facie case of unlawful discrimination, the employee must show: "(1) he was a member of a protected class, (2) he was qualified for the position he sought . . . , (3) he suffered an adverse employment action, such as . . . denial of an available job, and (4) some other circumstance suggests discriminatory motive." (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 355 [100 Cal.Rptr.2d 352, 8 P.3d 1089] (*Guz*).) If a prima facie case is established, the employer must identify a "legitimate, nondiscriminatory" reason for the adverse action. (*Id.* at pp. 355–356.) In this context, "legitimate" reasons "are reasons that are *facially unrelated to prohibited bias*, and which, if true, would thus preclude a finding *of discrimination.*" (*Id.* at p. 358.) To avoid summary judgment, the employee must then "offer substantial evidence that the employer's stated nondiscriminatory reason for the adverse action was untrue or pretextual, or evidence the employer acted with a discriminatory animus, or a combination of the two, such that a reasonable trier of fact could conclude the employer engaged in intentional discrimination." (*Hersant v. Department of Social Services* (1997) 57 Cal.App.4th 997, 1004–1005 [67 Cal.Rptr.2d 483] (*Hersant*).) " 'The

[employee] cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent. . . .' " (*Id.* at p. 1005.)

Defendant does not dispute that plaintiff established a prima facie case of age discrimination with respect to the hiring of Blanchard-Saiger, and plaintiff does not dispute that defendant has identified legitimate, nondiscriminatory reasons for the hiring decision. Plaintiff was therefore required to " 'demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [the] proffered legitimate reasons for [the] action that a reasonable factfinder *could* rationally find them "unworthy of credence," [citation], and hence infer "that the employer did not act for [the asserted] non-discriminatory reasons." [Citations.]' " (*Hersant, supra,* 57 Cal.App.4th at p. 1005.)

Plaintiff contends that his superior qualifications, defendant's inconsistent justifications for the hiring decision, and defendant's spoliation of relevant evidence, either alone or in combination, constituted substantial evidence of pretext sufficient to defeat the summary judgment motion. We therefore turn to the law and the record in each of these areas.

## C. *Qualifications*

■ "In cases involving a comparison of the plaintiff's qualifications and those of the successful candidate, we must assume that a reasonable juror who might disagree with the employer's decision, but would find the question close, would not usually infer discrimination on the basis of a comparison of qualifications alone. In a close case, a reasonable juror would usually assume that the employer is more capable of assessing the significance of small differences in the qualifications of the candidates, or that the employer simply made a judgment call. [Citation.] But this does not mean that a reasonable juror would in every case defer to the employer's assessment. If that were so, no job discrimination case could ever go to trial. If a factfinder can conclude that a reasonable employer would have found the plaintiff to be *significantly better* qualified for the job, but this employer did not, the factfinder can legitimately infer that the employer consciously selected a less-qualified candidate—something that employers do not usually do, unless some other strong consideration, such as discrimination, enters into the picture." (*Aka v.*

*Washington Hospital Center* (D.C. Cir. 1998) 332 U.S. App.D.C. 256 [156 F.3d 1284, 1294], italics added (*Aka*).)[2]

While not all cases hold that "the disparity in candidates' qualifications 'must be so apparent as to jump off the page and slap us in the face to support a finding of pretext' " (*Raad v. Fairbanks North Star Borough School Dist.* (9th Cir. 2003) 323 F.3d 1185, 1194 (*Raad*)), the precedents do consistently require that the disparity be substantial to support an inference of discrimination. (See *Weiss v. JPMorgan Chase & Co.* (2d Cir., June 5, 2009, No. 08-0801-cv) 2009 U.S.App. Lexis 12121, pp. *9–*10 (*Weiss*) ["stark disparity" between qualifications called into question whether employer's rationales were pretextual]; *Chappell-Johnson v. Bair* (D.D.C. 2008) 574 F.Supp.2d 87, 100 (*Chappell-Johnson*) [" 'vastly superior' qualification necessary to create a genuine factual issue"]; *Aka, supra,* 156 F.3d at p. 1295 [summary judgment denied where inter alia "balance of qualifications weighed markedly in [the plaintiff's] favor"]; *Raad, supra,* 323 F.3d at p. 1194 [discrimination could be found where the plaintiff's qualifications " 'were clearly superior to the qualifications of the applicant selected' "].)

The evidence concerning plaintiff's and Blanchard-Saiger's qualifications has been set forth above.[3] On the one hand, plaintiff had more experience than Blanchard-Saiger on "labor," as opposed to "employment," matters.[4] On the other hand, Blanchard-Saiger, whose resume listed management of all

---

[2] Cases construing federal antidiscrimination laws can constitute persuasive authority with respect to parallel provisions of the FEHA. (See, e.g., *Guz, supra,* 24 Cal.4th at p. 362; *Sandhu v. Lockheed Missiles & Space Co.* (1994) 26 Cal.App.4th 846, 851 [31 Cal.Rptr.2d 617].)

[3] Plaintiff attempted to bolster his claim to superior qualifications with information about Blanchard-Saiger from the Foley & Lardner Web site, and with a declaration from Kenneth Anderson, a retired hiring partner in the law firm of Gibson, Dunn & Crutcher, who opined that "the paper qualifications for the advertised labor attorney position presented by [plaintiff] are demonstrably superior to those presented by Gail Blanchard-Saiger."

As relevant here, the biographical information at the Web site merely indicated that Blanchard-Saiger had "extensive labor and employment law experience," and thus added nothing material regarding her background.

Defendant objected to the expert declaration on the ground, among others, that Anderson had "spent his entire career at a single law firm and knows nothing about the hiring practices or hiring requirements of a transportation company such as defendant." The court sustained the objection, finding that Anderson "did not adequately establish his qualifications in the selection and hiring of in-house counsel, for a position such as the subject position." Plaintiff argues in passing that this ruling was erroneous, but we find no abuse of the court's broad discretion in assessing expert qualifications. (*Putensen v. Clay Adams, Inc.* (1970) 12 Cal.App.3d 1062, 1080 [91 Cal.Rptr. 319].)

[4] Biard said that there was a difference in his mind between a labor attorney and an employment attorney. "I look at a labor attorney," he said, "as being more NLRB-based, et cetera. I look at an employment attorney as handling claims for . . . discrimination, wrongful termination . . . all the things . . . unassociated with the unions, let's say." Plaintiff likewise

phases of employment litigation in state and federal courts, had the more recent employment law experience. Plaintiff acknowledged that he did not handle any employment discrimination cases, or wrongful termination cases that did not involve a collective bargaining agreement, while he worked at the NLRB. It is incorrect to assert, as defendant repeatedly claims in his appellate brief, that plaintiff's resume did not indicate that he had employment litigation experience; the resume stated that he had "[r]epresented clients in . . . employment discrimination and wrongful termination litigation." However, nothing in the resume suggested that this experience was in any way substantial. As Biard pointed out in his deposition, employment litigation "seemed not to be the focus" of plaintiff's resume. "I don't think that I saw in my perusal of this resume that there was a significant amount of litigation experience. Right or wrong, that was my presumption at the time." Thus, from the standpoint of an employer, to quote defendant's job announcement, seeking "an experienced attorney in traditional labor law and employment litigation," plaintiff's and Blanchard-Saiger's qualifications were essentially equal, with plaintiff having the edge in one area, Blanchard-Saiger in the other.

Plaintiff observes that most of the experience requirements listed in the job notice involved labor rather than employment law. With numbers added, the notice sought experience: "[(1)] representing management in labor/management issues; [(2)] practice before the NLRB; [(3)] grievance and arbitration under CBAs; [(4)] collective bargaining and/or counseling of clients with CBA/labor dispute issues, and [(5)] proven employment litigation experience . . . ." Plaintiff apparently reasons that because his credentials in four of the five areas were superior to those of Blanchard-Saiger, he was demonstrably more qualified for the job. However, the fact that four facets of labor law experience were sought did not necessarily mean that experience in that area was four times more valuable to defendant than employment law experience. Biard testified that, when he interviewed Blanchard-Saiger, he envisioned that 50 percent of the work in the position would be in labor law. Blanchard-Saiger testified that her impression from the interview was that the job would likely involve only "30 to 40 percent traditional labor." Thus, Biard's testimony at another point that he anticipated labor law work being "a majority of the job" cannot be taken to refer to a great majority that would have overshadowed qualifications in other areas.

Plaintiff argues that Blanchard-Saiger's employment law experience "should be discounted . . . because she told Biard that she would not do employment litigation if hired and Biard told her she would not be given such work." However, Biard told Blanchard-Saiger that she would be required to

testified, "I consider NLRB work to be traditional labor law work. Employment discrimination matters I consider employment law."

handle litigation matters in the short term, and he testified that, after her interview, he had to weigh her unwillingness "to do litigation in the long term"—her only negative quality—against her positive qualities, before extending her an offer. Thus, while Biard was ultimately willing to tailor the position to accommodate Blanchard-Saiger's wishes, that decision did not change the fact that he was looking for employment litigation experience when he advertised the position and selected candidates for interviews.

Even if plaintiff's labor law background could be deemed to have outweighed Blanchard-Saiger's employment law experience to some degree, Blanchard-Saiger had a number of advantages that plaintiff did not. She had been recommended by an attorney Biard respected, she had a New York bar membership that might be useful to the company, and she had law firm experience that Biard valued.

Accordingly, plaintiff's qualifications cannot reasonably be viewed as " 'vastly superior' " to those of Blanchard-Saiger. (*Chappell-Johnson, supra,* 574 F.Supp.2d at p. 100.) Here, as in *Lomotey v. Conn.-DOT* (2d Cir., Dec. 4, 2009, No. 09-0466-cv) 2009 U.S.App. Lexis 26345, page *4, plaintiff's qualifications were not "so superior to those of the person selected . . . as to make the selection of that person unreasonable, as . . . required for a credentials-based finding of pretext."

## D.   *Inconsistent Explanations*

■ A triable issue as to an employer's veracity "may arise where the employer has given shifting, contradictory, implausible, uninformed, or factually baseless justifications for its actions." (*Guz, supra,* 24 Cal.4th at p. 363; see *Equal Employment Opportunity Com. v. Ethan Allen, Inc.* (2d Cir. 1994) 44 F.3d 116, 120 (*Ethan Allen*) [where " 'fundamentally different justifications' " were offered, changing explanations could be considered "pretextual, developed over time to counter the evidence suggesting age discrimination"].)

### (1)   *Record*

Biard left his position with defendant in April or May of 2006; he was later interviewed by a DFEH investigator in connection with plaintiff's discrimination claim, and the record includes what appear to be the investigator's typewritten notes of the interview. According to this document, Biard told the investigator that he had interviewed only three candidates for the job because he was working long hours and did not have time for a lot of interviewing. The successful candidate had come "highly recommended by a well respected colleague" and had "graduated at the top of her class with excellent academics." Plaintiff "appeared to have a lot of labor experience," but "did not have

litigation experience as it relates to wrongful termination/discrimination." Biard was put off by receiving plaintiff's application through plaintiff's employer's Web site during working hours, and plaintiff had sent e-mails Biard regarded as "egotistical." Biard "stated he did not consider age when selecting applicants for interview." Biard testified that he did not have plaintiff's resume in front of him during the DFEH interview, and that he told the investigator that, in his opinion, plaintiff did not have "a requisite amount" of employment litigation experience, not that he had no such experience.

In its responses to DFEH's interrogatories, defendant stated that plaintiff was not considered qualified for the position.[5] Subsequently, in response to plaintiff's interrogatory asking whether it contended that he was not qualified for the job, defendant answered, "[b]ased on the resume he presented, no." In its initial and supplemental responses to plaintiff's interrogatories, defendant stated that plaintiff was not interviewed because "[t]he first candidate interviewed appeared to meet all of the job requirements and was otherwise so outstanding that [defendant] hired her before any other applicants were interviewed."

### (2)  Analysis

Plaintiff parses Biard's deposition testimony and the notes of his DFEH interview for contradictions as to Biard's reasons for hiring Blanchard-Saiger instead of him, but we find none that are consequential. In his deposition and interview, Biard consistently identified the e-mails and the apparent dearth of employment litigation experience that had given him negative impressions of plaintiff. In his deposition he explained that he did not bypass plaintiff for an interview because of those negative impressions, but rather because he lacked time to interview all qualified candidates, and found one whom he regarded as exceptionally well qualified early in the interview process—reasons he had also cited to the DFEH investigator. Plaintiff notes that defendant's interrogatory responses stated that Blanchard-Saiger was the only one interviewed,

---

[5] In response to an interrogatory asking for a description of the staff attorney position in question, defendant provided a job description stating that it was "seeking an experienced attorney in traditional labor law, employment litigation, and advice and counseling. . . . [¶] . . . [¶] Job Requirements: Qualified candidates should demonstrate substantial experience providing advice and counsel on a variety of labor and employment issues, including but not limited to Family Medical Leave, discrimination, wage/hour, investigation, collective bargaining agreement interpretation and application, labor disputes, investigations and other employee relation issue[s]; representing management before administrative agencies including the Equal Employment Opportunity Commission, Department of Labor, and National Labor Relations Board; representing management in labor arbitrations; and handling and/or managing civil litigation." Plaintiff faults defendant for failing to provide the actual job notice used, but we find no material difference between that notice and the job description given to the DFEH.

whereas Biard mentioned three or four interviews in his interview and deposition, but this discrepancy did not qualify as a shifting rationale for the hiring decision. Defendant first indicated in answers to DFEH interrogatories that defendant was considered unqualified, but then conceded in answers to plaintiff's interrogatories that it was not making that contention. However, this discrepancy was relatively insignificant because Biard was solely responsible for the hiring decision and his views of plaintiff's qualifications were consistently stated. (Cf. *Weiss, supra,* 2009 U.S.App. Lexis 12121 at p. *11 [shifting explanations from the one primary decision maker].) For these reasons, we find no inconsistency in the explanations for the hiring decision sufficient to raise a triable issue as to Biard's credibility.

Among the cases cited by plaintiff, *Ethan Allen, supra,* 44 F.3d 116, and *Byrnie v. Town of Cromwell, Bd. of Education* (2d Cir. 2001) 243 F.3d 93 (*Byrnie*) present useful contrasts to what occurred here. In *Ethan Allen,* the plaintiff alleged that he had been discharged because of his age. The defendant first claimed that the plaintiff's work was being phased out and had not been reassigned. When it turned out that the plaintiff's duties had in fact been reassigned to a significantly younger employee, the defendant's manager claimed that the plaintiff was terminated because of his aversion to travel and paperwork, but admitted that he had not followed the company's layoff policy in terminating the plaintiff. The manager then denied that the plaintiff's alleged refusal to travel and do paperwork contributed to his layoff, and the defendant's director of personnel claimed that the defendant had evaluated the plaintiff and the younger worker who replaced him in accordance with the defendant's layoff policy. "From such discrepancies a reasonable juror could infer that the explanations given by [the defendant] were pretextual . . . ." (*Ethan Allen, supra,* 44 F.3d at p. 120.) *Ethan Allen* is distinguishable with its significant discrepancies and shifting inconsistencies.

In *Byrnie,* the defendant hired an applicant younger than the plaintiff for a teaching position. The defendant first claimed that the plaintiff was not hired because he was unfamiliar with a teaching method assessment tool. When the defendant later admitted that none of the candidates had any significant familiarity with the assessment tool, two of the plaintiff's interviewers claimed that he was not hired "because he did not demonstrate familiarity with the basic competencies of effective teaching." (*Byrnie, supra,* 243 F.3d at p. 100.) Even apart from defendant's "21 1/2 years teaching experience," this latter assertion was "particularly hard to swallow given that [the plaintiff] had been a substitute teacher [for the defendant] for five years and was often asked to take over classes for extended periods when other teachers were on leave. It strains credulity to believe that a teacher unfamiliar with the competencies necessary for effective teaching would be relied upon for so long. This is particularly the case given that one of [the defendant's] own teachers wrote a glowing recommendation for [the plaintiff] stating that [the

plaintiff] was the English Department's first choice for long-term substitute teaching assignments. [¶] The credibility of [the defendant's] justification for not hiring [the plaintiff] is further weakened when compared to the justification initially offered . . . ." (*Id.* at p. 105.)

The inconsistencies in defendant's position here are far slighter than those of the employers in *Ethan Allen* and *Byrnie*. Plaintiff quibbles that Biard told the DFEH that he interviewed three applicants, but testified to at least four interviews at his deposition. Plaintiff maintains that Riley's communication with Biard about Blanchard-Saiger was more of a "heads up" that her application would be arriving, than the "high[] recommend[ation]" Biard reported to the DFEH. However, Biard's imperfect recollections and slight exaggerations are not the kind of " 'fundamentally different justifications' " (*Ethan Allen, supra*, 44 F.3d at p. 120) for an employment decision that created triable issues in *Ethan Allen* and *Byrnie*.

In addition to his principal arguments, plaintiff submits that Biard's credibility can be questioned because he "resorted to subjective criteria"—"personality-wise, just click[ing]" with Blanchard-Saiger during her interview—"to justify his failure to interview [p]laintiff." Plaintiff notes, citing the *Byrnie* case among others, that subjective hiring criteria can be used to mask discriminatory intent. Again, however, *Byrnie* does not assist plaintiff. The *Byrnie* court found " 'nothing unlawful about an employer's basing its hiring decision on subjective criteria, such as the impression an individual makes during an interview.' " (*Byrnie, supra*, 243 F.3d at p. 104.) The problem with the defendant's position in *Byrnie* was not that it subjectively evaluated the plaintiff's interview performance, but rather that the shifting justifications given for the hiring decision called into question " 'whether age . . . was not a factor in the application of . . . subjective criteria' " concerning the plaintiff's allegedly poor interview. (*Id.* at p. 106.) Here, unlike *Byrnie*, there was no evidence suggesting that the impressions the interviewer reported could not be taken at face value. If Biard had not been genuinely impressed by Blanchard-Saiger, he presumably would not have granted her request to transition out of litigation, or offered her $20,000 more than the advertised salary for the position, in order to retain her. Thus, reliance on subjective hiring factors did not raise a triable issue of fact as to the employer's motives in this case.

E. *Spoliation*

(1) *Record*

Plaintiff asked defendant to produce the applications it received for the staff attorney position, and defendant responded that they could not be found.

In its interrogatory responses, defendant stated that "[a]ll job applications and resumes were discarded after an individual was hired for the position because they were no longer needed." Christina Pereira, defendant's director of human resources, testified in her deposition that defendant had no policy in 2005 or 2006 regarding retention of employment applications, and that defendant's practice in 2005 was to discard them.

Biard testified that he printed all the resumes he received, and directed that they be placed in a file before he left defendant's employment. In a declaration, Biard speculated that the documents may have been lost when defendant's legal department files were transferred from Fairfield, California, to Elk Horn, Iowa, in 2006. He declared, "There is nothing in the file [of applications] that would suggest that I hired Ms. Blanchard-Saiger, or that I did not interview [plaintiff] for an unlawful reason, and I never told anyone at [defendant] that there was anything in the file to be concerned about."

Biard testified that he had resumes and e-mails from Blanchard-Saiger and the other candidates he interviewed, along with documents pertaining to plaintiff's DFEH complaint, for a time on his personal laptop computer. He said that the computer was destroyed the week before his September 2008 deposition when it was dropped by people who were repairing it. The repair service retained the broken computer and gave him a new one. The relevant documents had been removed from the computer before this mishap.

(2) *Analysis*

Plaintiff argues that defendant's spoliation of potentially relevant evidence was "evidence of pretext" that precluded the granting of the summary judgment motion. He asks us to follow *Byrnie* and other federal precedents that have considered spoliation of evidence in the summary judgment context.

"Spoliation" is " 'the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation.' " (*Byrnie, supra,* 243 F.3d at p. 107.) "[D]estruction of evidence relevant to proof of an issue at trial can support an inference that the evidence would have been unfavorable to the party responsible for its destruction." (*Kronisch v. U.S.* (2d Cir. 1998) 150 F.3d 112, 126 (*Kronisch*); see also *Cedars-Sinai Medical Center v. Superior Court* (1998) 18 Cal.4th 1, 11 [74 Cal.Rptr.2d 248, 954 P.2d 511] (*Cedars-Sinai*).) "In order for an adverse inference to arise from the destruction of evidence, the party having control over the evidence must have had an obligation to preserve it at the time it was destroyed." (*Kronisch, supra,* 150 F.3d at p. 126.) In addition, the party seeking the benefit of an inference from spoliation "must demonstrate first that the records were destroyed with a

culpable state of mind (i.e. where, for example, the records were destroyed knowingly, even if without intent to violate [a] regulation [requiring their retention], or negligently). Second, a party must show that the destroyed records were relevant to the party's claim or defense." (*Byrnie, supra,* 243 F.3d at p. 109; but see *Cedars-Sinai, supra,* 18 Cal.4th at p. 14 ["there will typically be no way of telling what precisely the evidence would have shown and how much it would have weighed in the spoliation victim's favor"].)

Defendant had an obligation to preserve the applications for the staff attorney position for a minimum of two years. (Gov. Code, § 12946.) Evidence was presented that the records were "destroyed knowingly, even if without intent to violate the [statute]." (*Byrnie, supra,* 243 F.3d at p. 109.) According to defendant's interrogatory answers and Pereira's testimony, the applications were discarded pursuant to defendant's practice at the time. The culpable state of mind requirement was therefore satisfied, and we will assume that the applications might have disclosed evidence relevant to the case.

■ However, spoliation of evidence alone does not necessarily create a triable issue. In addition to spoliation, there must be " 'some (not insubstantial) evidence' for the plaintiff's cause of action . . . [to] allow the plaintiff to survive summary judgment." (*Byrnie, supra,* 243 F.3d at p. 107.) In *Byrnie,* which the court considered a "close case" even though the plaintiff had "clearly superior paper credentials" (*id.* at p. 110), and the defendant "had to retreat from . . . its initial explanation for failing to hire [him]," defense spoliation of evidence " 'push[ed] a claim that might not otherwise [have] survive[d] summary judgment over the line.' " (*Ibid.*) In *Chappell-Johnson,* however, no substantial evidence of pretext was presented and spoliation of evidence alone did not enable the plaintiff to avoid summary judgment. Where other substantial evidence of a discriminatory motive is lacking, "no reasonable jury could award damages against [the] employer based *solely* on *speculation* as to what *might* be contained in documents *not in evidence.*" (*Chappell-Johnson, supra,* 574 F.Supp.2d at p. 102.)

■ If we set aside the spoliation of evidence issue, defense entitlement to summary judgment is not a close question in this case, unlike the situation in *Byrnie.* As we have explained, plaintiff did not have clearly superior paper credentials and defendant did not offer inconsistent justifications for the hiring decision. Here, as in *Chappell-Johnson,* spoliation alone does not create a triable issue.[6]

---

[6] Because we conclude that summary judgment was properly granted on the state of plaintiff's evidence, we need not determine the probative value of the defense evidence that Saupe, an attorney in plaintiff's age range, was hired at the same time as Blanchard-Saiger.

## III. DISPOSITION

The judgment is affirmed.

Margulies, J., and Dondero, J., concurred.