Filed 7/29/14  Passy v. Gabbard CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| PATRICIA PASSY,<br><br>    Plaintiff and Appellant,<br><br>        v.<br><br>RENEE GABBARD et al.,<br><br>    Defendants and Respondents. | G047425<br><br>(Super. Ct. No. 07CC08371)<br><br>O P I N I O N |
| PASSY-MUIR, INC.,<br><br>    Plaintiff and Appellant,<br><br>        v.<br><br>RENEE GABBARD et al.,<br>    Defendants and Respondents. | (Super. Ct. No. 07CC08372) |
| PATRICIA PASSY, as Executor, etc.<br><br>    Plaintiff and Appellant,<br><br>        v.<br>RENEE GABBARD et al.,<br><br>    Defendants and Respondents. | (Super. Ct. No. 07CC08429) |

Appeal from a judgment of the Superior Court of Orange County, Steven L. Perk, Judge. Affirmed.

Mixon, Jolly and Cameron M. Jolly for Plaintiff and Appellant Patricia Passy.

The Hall Law Corporation and Laurence C. Hall for Plaintiff and Appellant Passy-Muir, Inc.

Law Offices of David Berkovitz and David A. Berkovitz for Plaintiff and Appellant Patricia Passy, as executor for the estate of Elizabeth Fontes.

Paul Hastings, Jamie Broder, Kimberly I. Kepler, Abigail W. Lloyd, Benjamin M. Cutchshaw, Stephen B. Kinnaird; O'Melveny & Myers and Michael G. Yoder for Defendants and Respondents Paul Hastings LLP and Renee Gabbard.

*     *     *

This appeal is from consolidated legal malpractice cases. Plaintiff Patricia Passy (Patricia), the company she owns, Passy-Muir, Inc. (Passy-Muir), and her daughter, Elizabeth Fontes (Elizabeth), sued defendants Paul Hastings LLP (Paul Hastings) and one of its partners, Renee Gabbard, for alleged malpractice arising from work Gabbard did on Patricia's estate plan. Gabbard prepared a trust to which Patricia sold much of her Passy-Muir stock. The beneficiary was her other daughter, Melissa Fontes (Melissa). Some years later, Patricia and Melissa had a massive falling out that involved litigation and maneuvering for control of Passy-Muir. Eventually the intra-family lawsuits settled by, among other things, unwinding the stock sale, and plaintiffs sought to recover from defendants the approximately $4 million they spent unwinding the stock sale.

After the close of evidence, the court granted a nonsuit motion as to Elizabeth's case, finding there was no evidence that defendants breached a duty to Elizabeth. The jury returned a complete defense verdict on Patricia's case.

2

Elizabeth passed away after the trial but before the appeal. Her appeal is now prosecuted by Patricia as the executor of Elizabeth's estate. Patricia and Passy-Muir raise three contentions on appeal.

First, they contend substantial evidence does not support the judgment. We conclude they waived that argument by failing to present a statement of facts that presents all of the evidence, both favorable and unfavorable, supporting the judgment.

What remains of their appeal is alleged evidentiary errors. They contend the court erred by permitting Gabbard to testify that, at the time of her deposition, she had been undergoing treatment for late-stage cancer. The court had initially ruled in limine that such testimony was inadmissible, but after seeing how plaintiffs used Gabbard's deposition testimony to impeach her, the court reversed course. We conclude this was within the court's discretion.

Plaintiffs also claim the court erred by excluding the testimony of their expert witness who proposed to testify that the backdating of certain documents increased the chances of triggering an IRS audit. The court excluded the testimony as speculative about what the IRS would do. Again, this was within the court's discretion.

Finally, the court excluded Gabbard's deposition testimony where she opined, in the abstract, that "backdating" is a fraud on the IRS. We agree with the court that this testimony was irrelevant because Gabbard was not commenting on the documents at issue here.

With respect to Elizabeth's appeal, we hold the trial judge correctly ruled there was no evidence that Paul Hastings breached a duty to her. Accordingly, we affirm.

3

FACTS

Patricia had three children, Elizabeth, Melissa, and Ross. Patricia founded Passy-Muir, a successful company that brought a medical valve to market that permits patients who have had a tracheostomy to speak and swallow.

In 1989, Elizabeth suffered an automobile accident that left her permanently disabled. As a result of litigation surrounding the accident, Elizabeth recovered approximately $2 million. Her estimated medical care, however, was over $13 million, and thus a high priority for Patricia was to ensure that Elizabeth maintained medical insurance. Elizabeth was insured under Patricia's ex-husband's private insurance, but that insurance would lapse in the event the ex-husband died.

During the 1990's, as a result of advice from her personal attorney (who is not involved in this lawsuit), Patricia began transferring assets to Melissa to avoid estate taxes. At that time, Patricia owned 60 percent of the voting shares of Passy-Muir stock. Her business partner, who owned the remaining 40 percent, decided to sell. Patricia bought the stock in Melissa's name. Also, Patricia founded a company to manufacture Passy-Muir's product and placed 100 percent of the stock in Melissa's name.

As a result of Patricia's concern over Elizabeth's maintenance of medical insurance, in 2001 Patricia consulted with an attorney who specialized in public benefits to help ensure Elizabeth would be eligible for Medicare and/or Medi-Cal. In conjunction with that consultation, at Patricia's direction, Elizabeth gifted to Melissa $300,000 in February 2001 and $584,305 in February 2002. Elizabeth filed gift tax returns for both transfers.

Following a similar strategy, in 2001 Patricia retained a prominent trust and estate attorney from Rutan & Tucker, where Melissa worked as an attorney, to put together an estate plan. The basic structure of the plan was to leave everything to Melissa, and, if Melissa were to predecease Patricia, to leave everything to a "special

4

needs" trust to benefit Elizabeth. The special needs trust was specifically crafted not to disqualify Elizabeth from receiving benefits from Medicare or Medi-Cal. It includes a provision, stating, "It is the Trustor's intention that . . . no part of the principal or income of this trust shall be subject to the claims of any public office, agency or department of the State of California or United States for the provision of care and services, including, but not limited to, residential care." In summarizing the structure of the plan, Patricia's attorney wrote, "Please note that if Melissa survives you, Elizabeth and your son will receive no part of your estate."

At the time of these transfers, Patricia and Melissa were very close. Patricia testified her friends were jealous of their relationship and would joke that they were joined at the hip. The unifying idea behind these financial transfers was that the family would "pool" their money for everyone's expenses, and even though many of the assets were in Melissa's name, the family trusted Melissa to pay expenses as needed. There was no formal legal mechanism, however, to ensure her compliance. Indeed, Patricia's estate plan contained a provision *requesting*, but not requiring, that Melissa take care of Elizabeth

In 2003, Patricia consulted with Gabbard at Paul Hastings. As a result of the initial consultation, Paul Hastings was retained by Patricia, Melissa, Elizabeth, and Passy-Muir. The retainer agreement signed by Patricia and Elizabeth stated, "I look forward to working with you to meet your immediate and long term estate planning goals." Elizabeth's retainer agreement contained a conflict waiver stating: "At this time, we will also represent Patricia Passy and Melissa Fontes. While we will make every attempt to maintain your confidences, conflicts may arise." "Family members often have conflicting interests when estate planning is being done that concerns their property." "The fact that one of you may desire property to go in a way different than the other desires must also be considered. As lawyers for the family members represented and

5

you, we cannot assert one of your positions over the other." Patricia's agreement contained a similar waiver.

Initially, Patricia asked Gabbard to transfer title to a residence from Elizabeth's name to Patricia's trust. Aside from the very first bill, none of the remaining Paul Hastings bills mention doing any further work for Elizabeth.

The primary project for which Gabbard was retained was business succession planning — i.e., avoiding estate taxes on the value of Passy-Muir shares in the event of Patricia's death. This was accomplished through a complex transaction involving what Gabbard described as a sale to an intentionally defective grantor trust, named the Passy Special Trust (the trust). Without delving too far into the details, this involved Patricia selling 90 percent of her nonvoting stock to the trust in exchange for $2.1 million, most of which was paid for with a note. As a result, Patricia would go from owning approximately 60 percent of the company to approximately 9 percent, though she would still hold 60 percent of the voting stock and thus retain control of the company. Patricia would still be liable for all of the taxes attributable to the shares in trust, which she would use the note payments to cover. After the note was paid off, the trust would become a *non*grantor trust, the effect of which was to transfer the tax liability to the trust itself. The trust was irrevocable, as that was the only way to avoid estate taxes. Both Patricia and Melissa were designated as trustees.

In counseling Patricia in this transaction, Gabbard warned Patricia about the large amount of stock she was selling, emphasizing that the transaction was irrevocable, and specifically counseled her to sell her stock in increments instead of all at once. She advised Patricia that circumstances can change, and conflicts can erupt, making such a large, immediate sale risky. Patricia assured her, however, that no conflict could erupt between her and Melissa and decided to proceed with the immediate sale.

The documentation for the transaction was signed by Patricia and Melissa in September 2003. Consistent with Patricia's prior estate plan, the trust disinherited

6

Elizabeth, stating, "For purposes of this instrument, Elizabeth Fontes shall be considered to have predeceased me leaving no descendants then living."

After the documents were signed, three significant errors were discovered. First, and most importantly, Gabbard had neglected to file documents with the Secretary of State to create the nonvoting stock. As a result, the purported sale had sold nonexistent stock. Second, through what appears to have been a math error, the documents understated the purchase price by approximately $210,000. Third, the transfer documents inadvertently transferred "common stock," rather than specifying nonvoting stock as the parties intended.

As a result of these discoveries, on December 30, 2003, Gabbard filed the appropriate documents to create the nonvoting stock. She could not immediately redraft the estate planning documents, however, because the valuation that had been done to support the sale price had become stale, requiring a new valuation. That valuation was completed in May 2004, resulting in a slightly higher valuation of $2.3 million. On June 4, 2004, Patricia and Melissa were sent the updated estate planning documents, which corrected each of the three errors identified above.

The updated documents were dated December 30, 2003. Gabbard explained that this was proper because the intent of the parties was to enter into the transaction as of that date. Indeed, the parties made distributions consistent with the transaction documents between the end of 2003 and June 2004.

Melissa was, nonetheless, understandably concerned about the tax consequences of redrafting the transaction. As a result, Paul Hastings issued an opinion letter stating "the legal consequences of closing the transaction as of September 9, 2003 (assuming that the Amended Articles had been filed as of such date) is equivalent to the legal consequences of closing the transaction as of December 30, 2003." The intended effect of the opinion letter was essentially an indemnification: if the IRS imposed any penalties based on a contrary view, Paul Hastings would pay the penalties out of pocket.

Also, Paul Hastings did not charge for the work it performed to fix the documents, and Paul Hastings paid for the updated valuation out of pocket.

In July 2004, the transaction having been completed, Paul Hastings closed the matter and terminated representation.

Everything appeared to have gone according to plan until sometime in the 2005 to 2006 timeframe when Melissa's relationship with Patricia began to deteriorate. Melissa, who was the president of Passy-Muir at the time, explained that the deterioration began with differences in management style at the company. The record is not entirely clear on what those differences were or why the conflicts continued to escalate. But by 2006 the relationship had crossed the thin line between love and hate. By way of illustration, in July 2006 Patricia left an angry voicemail for Melissa saying, as Patricia recounted, "she is no longer my daughter, I was throwing her pictures out as I spoke, I will never speak to her again and that . . . she will not even be invited to my funeral and that from this day forward she doesn't have a family."

As a result of the falling out, Patricia decided she wanted to recover the stock she had irrevocably transferred away to the trust. Melissa was willing to do so, but only if Patricia would indemnify her against any tax consequences of unwinding the transaction. Also, Melissa refused to give back the money that Elizabeth had previously gifted to her.

The parties did not reach an agreement at that time. So Patricia hired a team of litigators who, in the early part of 2007, came up with the idea of "detonat[ing] the twin nukes on Melissa, we fire her and we sue her." One year later, the plan was put into effect. In February 2008, Patricia and Elizabeth filed lawsuits against Melissa. However, the lawsuits were never served on Melissa. In March 2008, Patricia placed Melissa on administrative leave and subsequently reduced her salary.

In October 2009 the intra-family lawsuits settled. The basic terms of the agreement were that the 2003 stock transfer to the trust was unwound, Passy-Muir

8

redeemed Melissa's preexisting 40 percent *voting* interest in Passy-Muir for approximately $1.4 million, Patricia agreed to indemnify Melissa for any tax consequences of unwinding the stock transfer, and Elizabeth released any claim she had to the money she gifted Melissa in 2001 and 2002.[1] Patricia and Passy-Muir claim the dispute and subsequent settlement cost them over $4 million (which, in addition to the over $95,000 plaintiffs claim they paid defendants in legal fees, are the damages they sought).

In July 2007, Patricia, Passy-Muir, and Elizabeth filed three separate lawsuits against Gabbard and Paul Hastings alleging breach of contract, professional negligence, breach of fiduciary duty, and fraud. The cases were consolidated in May 2008.

Prior to trial the court decided two motions in limine at issue here.

Plaintiffs moved in limine to preclude any evidence "about defendant Renee Gabbard's cancer, medical condition and treatments." Defendants agreed in part, stating, "Ms. Gabbard's medical issues are not relevant to Plaintiffs' allegations," but expressed concern that plaintiffs intended to play video clips from Gabbard's deposition and argued they "should be permitted to rehabilitate Ms. Gabbard's credibility by explaining her condition at the time of her depositions." Defendants noted that, "the fact is that during Ms. Gabbard's deposition sessions, she was suffering from a multitude of aftereffects from extensive treatment for stage-three breast cancer. Her testimony was, to say the least, affected by this extreme health issue." The trial court granted the motion over defendants' objection with little comment. As explained in greater detail below, mid-trial the court reversed course and permitted Gabbard to briefly testify about her medical condition.

---

[1] Somewhat ironically, given plaintiffs' extensive complaints about the backdating of the revised estate planning documents, the settlement agreement has an effective date that is over a month before the actual signing date.

The second motion was defendants' motion in limine to exclude one of plaintiffs' witnesses. The witness was a former IRS agent in the criminal investigations division who would testify that IRS auditors frequently refer matters to the criminal division based on various "badges of fraud," including backdating, and that, based on his review, "the transfer of stock transaction documents prepared had a higher than normal chance of being scrutinized by IRS auditors . . . ." The court granted the motion. Later in the trial the court explained its reasoning as follows: "I don't care if he worked for the IRS for 25 years as an agent. For him to speculate about what the IRS is going to do in some instance in the future, even if it's based on his experience, is nothing more than speculation." "And it's just going to take us down a road that is — that is certainly well within 352 for me to exclude it." "It's just going to take us way, way . . . too far afield for us to be productive in terms of proof in this case."

The trial began in April 2012 and lasted over a month. After plaintiffs rested, defendants moved for a nonsuit on Elizabeth's claims. Defendants first argued there was no attorney-client relationship between Elizabeth and defendants. Second, defendants argued that Elizabeth's damages, which were only the money she had previously gifted to Melissa, were speculative.

The court granted the motion on the ground that, while there was an attorney-client relationship, the scope of that relationship encompassed estate planning matters, and since Elizabeth had already given her money away by the time defendants were retained, those funds were no longer part of her estate. The court stated, "Now, Ms. Gabbard or Paul Hastings may be very persuasive and may have been able to get it back for her, but that doesn't certainly fall within estate planning issues, at least not that I see here."

Elizabeth's counsel asked to reopen to present additional testimony from Gabbard and plaintiffs' expert witness on the scope of an attorney's duties, but did not specify what their testimony would have been. The court permitted Elizabeth's counsel

to give an offer of proof, but he did not offer anything specific and the court denied the request.

Patricia and Passy-Muir's case was submitted to the jury. The jury returned a verdict in favor of defendants. In particular, it found defendants' conduct did not fall below the standard of care, did not breach any fiduciary duties, did not breach the contract, and did not commit fraud. The jury polled 10 to two on the legal malpractice, breach of fiduciary duty, and breach of contract claims, and was unanimous on the fraud claim. The trial court entered judgment on the verdict and denied plaintiffs' subsequent new trial motion. Plaintiffs timely appealed.

DISCUSSION

*Patricia and Passy-Muir Waived their Substantial Evidence Argument*

We begin by addressing Patricia and Passy-Muir's contentions, the first of which is that substantial evidence does not support the verdict.

"A party who challenges the sufficiency of the evidence to support a finding must set forth, discuss, and analyze *all* the evidence on that point, *both favorable and unfavorable*." (*Doe v. Roman Catholic Archbishop of Cashel & Emly* (2009) 177 Cal.App.4th 209, 218, italics added.) As another court explained, appellants "fundamental obligation to this court, and a prerequisite to our consideration of their challenge" (*Schmidlin v. City of Palo Alto* (2007) 157 Cal.App.4th 728, 738), is to "set forth the version of events *most favorable to* [*respondent*]" (*id.* at pp. 737-738). "The duty to adhere to appellate procedural rules grows with the complexity of the record." (*Western Aggregates, Inc. v. County of Yuba* (2002) 101 Cal.App.4th 278, 290.) Here, the six week trial resulted in 20 volumes of reporter's transcript and 12 volumes of appendices. "Accordingly, if, as defendants here contend, 'some particular issue of fact is not sustained, they are required to set forth in their brief *all* the material evidence on

11

the point and *not merely their own evidence*.  Unless this is done the error is deemed to be waived.'"  (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881.)

Patricia contends she retained defendants to accomplish three objectives: "(1) care for and protect Elizabeth, (2) keep Patricia in control of Passy-Muir during Patricia's lifetime, and (3) allow Patricia to change the plan at any time."  Plaintiffs then go through each objective and set forth the evidence supporting their claim that the Paul Hastings plan failed to accomplish the stated objective.  They claim the plan disinherits Elizabeth.  They claim the plan ceded control of Passy-Muir to Melissa.  And they claim Patricia was told she could make changes to the plan at any time, when, in fact, it is irrevocable.

The problem is, their statement of facts reads like a jury argument and omits almost all of the evidence supporting the verdict.

With respect to disinheriting Elizabeth, for example, there is no mention of any of the history of deliberately depleting Elizabeth of assets to keep her eligible for public benefits.  There is no mention of Patricia's preexisting estate plan that largely disinherited Elizabeth.  And, of course, there is no mention of retaining a public-benefits attorney in conjunction with this plan.  These facts are all highly relevant to what Patricia's actual aims were and whether the trust accomplished those aims.

With respect to retaining control of the company, plaintiffs focus on the various actions Melissa did to try and assert control of the company.  But they omit the testimony of the various actions Patricia took demonstrating she was, in fact, in control. Patricia acknowledged in her testimony knowing that she was in control of the company in the 2004-2005 timeframe, and acknowledged several unilateral actions she was able to take prior to unwinding the stock transfer.  In 2007 she unilaterally increased the size of the board of directors from two to three.  She then appointed Passy-Muir's certified public accountant as the third board member.  Prior to the unwinding of the stock transfer, Patricia also removed Melissa as a signatory on company bank accounts.  In

12

October 2008, a year before the unwind, she placed Melissa on administrative leave and reduced her salary. All of these actions were taken when Melissa was still president of Passy-Muir. And none of them are mentioned in Patricia's brief. Nor do plaintiffs mention that it was Patricia who appointed Melissa as president of the company, a decision defendants had nothing to do with.

Finally, with respect to the irrevocability of the plan, plaintiffs completely omit the testimony that Gabbard specifically informed Patricia of its irrevocability beforehand.

Defendants asserted this waiver argument as the first argument in their brief. Plaintiffs addressed it last in their reply brief, and in doing so failed to address their duties to this court at all, stating only "defendants mistake cherry picking for a bountiful harvest." Witty rhetoric does not fulfill an appellant's duty to present all of the evidence in the light most favorable to the verdict. Having failed to do that, Patricia and Passy-Muir waived their substantial evidence argument.


*There Was No Evidentiary Error*

Next, plaintiffs contend three evidentiary rulings were error. We review evidentiary rulings under the abuse of discretion standard. (*Romine v. Johnson Controls, Inc.* (2014) 224 Cal.App.4th 990, 1000.)

First, plaintiffs contend it was error to permit Gabbard to testify that, at the time of her deposition, she was recovering from recent treatment for stage 3 cancer. As noted above, the trial court initially granted a motion in limine precluding Gabbard from testifying about her cancer over defendants' objection that plaintiffs' use of video clips from her deposition could paint a misleading picture.

Defendants' concerns soon materialized. From the outset of Gabbard's testimony, plaintiffs repeatedly utilized video clips of her deposition to impeach her. To take a sampling, in one instance plaintiffs presented hand-written notes that Gabbard

13

testified were notes she took, though at her deposition she only recognized a small portion of the notes as hers. In another instance plaintiffs' attorney was questioning Gabbard about the lack of attorney notes in the file, to which she responded she does most of her note taking by actually drafting in the client's presence. Plaintiff then played a video clip of Gabbard being asked whether she kept notes of client discussions, to which she replied, "I'm fine with the notes I keep. I'm a very, very good attorney." In another instance counsel asked Gabbard what she had been researching for Elizabeth, and she replied she was looking into Patricia's support obligations as a parent. At Gabbard's deposition, however, she did not recall what she was researching. After Gabbard testified that she remembered at trial because of certain documents she reviewed, plaintiffs' counsel pressed her on the fact that the same exhibits were available at the deposition, saying, "and you don't know why, when you read this to prepare for trial, why you remembered, but you didn't remember at your deposition; right?" After a side bar counsel struck that question, and the court admonished the jury to "disregard any insinuation from the last question that was asked," but, of course, the jury had heard it. Also, during the playback of one of the deposition clips, Gabbard apparently had some sort of spontaneous reaction, though the record is not clear on exactly what happened.

After this impeachment, the court reversed course on its motion in limine ruling. The court explained that it had "granted that with the proviso that it was subject to somebody opening the door, specifically if the plaintiffs attack her credibility concerning answers she gave at the depo and/or other answers she's had in the past. I just don't see any choice that I have but to offer her, or at least allow her to explain that."[2] "[I]f you look at the whole thing, you're trying to impeach her testimony from the deposition to that of the trial, her medical condition at the depo[sition]. I just think that in just fairness to her, she should be allowed to explain. If there is a reason for different

_____

[2]     The "proviso" the court referred to does not appear in the record.

14

answers or incorrect answers or inappropriate answers, she's certainly going to be allowed to do that."

After the ruling Gabbard testified, "I had just finished treatment for Stage 3C fully metastasized breast cancer, and I had gone through eight rounds of chemotherapy and three surgeries and two months of daily radiation that stopped in November of 2010. [¶] And that deposition was taken two weeks afterwards. I was still in a lot of pain from radiation. And, I'm sorry, I don't know if it was my weight or my hair or the woman's voice, but that deposition was to preserve my testimony in case I were to die, and I went right back to that point in time." Afterwards, plaintiffs moved for a mistrial, which was denied  The next day, the court permitted plaintiffs to take another deposition of Gabbard to explore her health condition and to obtain additional documents. Plaintiffs did not take the court up on the offer.

Plaintiffs contend the court abused its discretion under Evidence Code section 352 in admitting Gabbard's testimony. We disagree. Gabbard's health condition was clearly probative to the rehabilitation of her testimony. Plaintiffs opened the door to rehabilitation testimony by impeaching Gabbard with her deposition testimony, and particularly by playing video clips where Gabbard's demeanor may have looked haggard. The court did not permit defendants to belabor the point, and the sum total of the testimony concerning her cancer takes up less than one page of the reporter's transcript. It was never mentioned again at trial, and plaintiffs were given the opportunity to take additional discovery concerning Gabbard's medical condition. Admitting this testimony was well within the court's discretion.

Next, plaintiffs contend the court erred by excluding the testimony of their expert who intended to testify about the likelihood of the stock transfer and estate plan triggering an IRS audit. The trial court excluded the testimony as both speculative and inadmissible under Evidence Code section 352.

15

The court's ruling was within its discretion. The expert's testimony was, at best, marginally relevant. Plaintiffs were primarily seeking to recover the cost of unwinding the stock transfer. That unwinding had nothing to do with the possible threat of an IRS audit. Perhaps it had some relevance to plaintiffs' claim for the recovery of the attorney fees paid to Paul Hastings, but even that is tenuous. Against this dearth of relevance, the proposed testimony about "badges of fraud" had the risk of confusing the jury by offering testimony on issues the jury was to consider. (See *Kotla v. Regents of University of California* (2004) 115 Cal.App.4th 283, 286 [expert may not testify as to "indicators" of retaliation].) It was also speculative as to whether there would be any future audit or investigation and whether the results of that audit would impact the tax savings generated by the trust.

Plaintiffs claim the testimony was essential to "respond to the defense that the estate plan would yield 'significant tax benefits.'" As the trial court ruled, however, plaintiffs were free to put on expert testimony to prove that the plan did not offer tax benefits, or that its provisions were illegal and thus any tax benefits were illusory. Testimony about the possibility of an IRS audit at some future point in time was not essential to responding to defendants' contention. Accordingly, the court did not abuse its discretion in excluding it.

Finally, in a similar vein, plaintiffs claim the court erred in excluding deposition testimony of Gabbard where she admitted that "backdating documents is a fraud on the IRS." Plaintiffs paint this as a damning admission, but in fact it was no more than an opinion, in the abstract, that "backdating," which went undefined, is a fraud on the IRS. She did not admit that the stock transfer in this case involved "backdating" and thus constituted a fraud on the IRS. Her opinion in the abstract was not relevant.

16

*Paul Hastings Did Not Breach a Duty to Elizabeth*

We turn now to Elizabeth's appeal, which comes to us after the grant of a nonsuit. Thus we apply the opposite standard of reivew.

"We independently review an order granting a nonsuit, evaluating the evidence in the light most favorable to the plaintiff and resolving all presumptions, inferences and doubts in his or her favor. [Citations.] 'Although a judgment of nonsuit must not be reversed if plaintiff's proof raises nothing more than speculation, suspicion, or conjecture, reversal is warranted if there is "some substance to plaintiff's evidence upon which reasonable minds could differ . . . ."' [Citation.] In other words, '[i]f there is substantial evidence to support [the plaintiff's] claim, *and* if the state of the law also supports that claim, we must reverse the judgment.'" (*Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107, 1124–1125.)

Elizabeth's primary contention on appeal is that the evidence was sufficient to support her claim that defendants had a sua sponte duty to attempt to retrieve the money that she transferred to Melissa, which she claims was a loan or an oral trust. Defendants had this duty, according to Elizabeth, despite that the transfers occurred before defendants were retained, and despite that no one asked defendants to undertake such work.

In support of her claim, Elizabeth cites *Nichols v. Keller* (1993) 15 Cal.App.4th 1672 (*Nichols*). *Nichols* held that attorneys retained to prosecute a worker's compensation claim had a duty to advise the client that he had a civil claim against a third party. (*Id.* at pp. 1685-1687.) The court reasoned as follows: "One of an attorney's basic functions is to advise. Liability can exist because the attorney failed to provide advice. Not only should an attorney furnish advice when requested, but he or she should also volunteer opinions when necessary to further the client's objectives. . . . even when a retention is expressly limited, the attorney may still have a duty to alert the client to legal problems *which are reasonably apparent*, even though they fall outside the scope of the

17

retention. The rationale is that, as between the lay client and the attorney, the latter is more qualified to recognize and analyze the client's legal needs. The attorney need not represent the client on such matters. Nevertheless, the attorney should inform the client of the limitations of the attorney's representation and of the possible need for other counsel." (*Id.* at pp. 1683-1684, italics added.)

We begin by rejecting Elizabeth's contention that the transfers to Melissa were loans or oral trusts. They were gifts. Elizabeth filed gift tax returns. We do not consider Patricia's and Elizabeth's testimony characterizing the transfers as loans as substantial evidence. Absent a compelling explanation for why the tax returns were incorrect, we will not permit a party to characterize a transfer one way on tax returns and another way for litigation purposes.

Given this record, the pre-existing gifts did not represent a reasonably apparent legal problem such that defendants had a sua sponte duty to provide advice concerning them.

Gifts are a legitimate estate planning tool. As explained by one treatise, "Lifetime gifts have a number of tax advantages. This is particularly true for older individuals whose estates will likely be subject to federal estate taxation. Gift planning for estates that exceed the applicable estate tax exclusion amount under IRC §2010 is an important vehicle for shifting wealth to younger generations, especially with the availability of the annual gift tax exclusion." (Oldman, Noncharitable Intervivos (Lifetime) Gifts (Cont.Ed.Bar. 2014) § 8.2.) At the same time, it warns, "Gift planning must always take into consideration the loss of the present income to the donor and the potential risk to the donor's future financial security. Thus, before making a gift, future emergencies or investment opportunities must be considered, as well as any liquidity problems that may arise after the transfer of property from the donor to the donee." (*Id.* at § 8.5.) There is nothing obviously wrong with large gifts as part of an overall estate plan. There are risks and benefits. In this respect, the presence of large gifts in

18

Elizabeth's history is fundamentally unlike the third-party claim in *Nichols*, *supra*, 15 Cal.App.4th 1672, where the attorney's failure to advise the client was virtually certain to result in the state of limitations running and the claim being lost.

In the context of this case, the gifts from Elizabeth to Melissa were undertaken as part of a deliberate plan of minimizing Elizabeth's assets to ensure she remained eligible for public benefits. This plan was undertaken with the assistance of an attorney who specialized in public benefits. Gabbard was not asked for any advice concerning public benefits, and she did not practice in the area of benefits planning. Further, at the time, the familial relationship between Elizabeth and Melissa was entirely amicable and Melissa recognized a moral obligation to use the money in her care to provide for the family. Thus, there was no reasonably apparent legal problem giving rise to a sua sponte duty to provide unsolicited advice. Moreover, there is no evidence that Elizabeth specifically sought advice concerning the advisability of the inter-vivos gifts. Indeed, Patricia could not recall at trial whether she even mentioned those transfers to Gabbard in the 2003-2004 timeframe, much less sought any advice concerning them. Accordingly, defendants did not breach a duty of care in failing to render unsolicited advice.[3]

---

[3] We note that Elizabeth included a heading in her *statement of facts* that the court erred by refusing her request to reopen evidence. Elizabeth did not make that contention in her legal argument section. To the extent Elizabeth intended to pursue this argument on appeal, it was waived. Argument should not appear in the statement of facts at all, and that certainly should not be the only place it appears. Even if it had not been waived, however, we would affirm. Although Elizabeth is correct that she had a right to reopen in response to the nonsuit motion (*S. C. Anderson, Inc. v. Bank of America* (1994) 24 Cal.App.4th 529, 537), the error was harmless because, when given the opportunity to present an offer of proof, her counsel did not have any specific evidence he would proffer, much less evidence that could cure the deficits described above. (See *Id.* at p. 538 ["On the other hand, a trial court's denial of a motion to reopen following the grant of a nonsuit will not be overturned when the additional evidence sought to be produced by the plaintiff is either irrelevant to the issues involved in the action (no error) or would not be sufficient to render defendants liable as a matter of law (no prejudice)"].)

In a related argument, Elizabeth contends she is entitled to the benefit of all inferences from defendants' destruction of evidence. In particular, Elizabeth argues that, despite Gabbard's practice of always taking notes, defendants' file does not contain any attorney notes with the exception of a single page of notes from Gabbard's first meeting with Patricia. Based on this evidence, with respect to Patricia and Passy-Muir's case, the court instructed the jury, "You may consider whether one party intentionally concealed or destroyed evidence. If you decide that a party did so, you may decide that the evidence would have been unfavorable to that party."

What Elizabeth fails to explain, however, is what legitimate inference we are supposed to draw. The closest she gets to offering anything specific is to point to the notes of Patricia's financial advisor, who was involved in the meetings with Gabbard, which has a notation concerning, as Elizabeth describes them, "how to protect [Elizabeth's] assets." What those notes actually discuss is "keeping Elizabeth's assets protected from court judgment," and go on to emphasize the importance of "moving property out of Elizabeth's name." These notes are consistent with the evidence we have discussed above.

A party seeking the benefit of a spoliation defense must articulate some nonspeculative inference to be drawn from the spoliation. (See *Reeves v. MV Transportation, Inc.* (2010) 186 Cal.App.4th 666, 682 ["'a party must show that the destroyed records were relevant to the party's claim or defense'"].) While courts should provide some leeway in this requirement, as the spoliation itself hinders explanation, courts cannot invent inferences out of thin air. (*Ibid.*) Here, Elizabeth has not articulated any specific inference that would have created substantial evidence to salvage her case.

DISPOSITION


The judgment is affirmed.  Defendants shall recover their costs incurred on appeal.[4]



IKOLA, J.

WE CONCUR:


ARONSON, ACTING P. J.


THOMPSON, J.

---

[4]      In addition to the rulings discussed above, Patricia and Passy-Muir appealed from an order on a motion to tax costs.  These appellants did not address that order in their briefs, however, and thus waived their appeal from it.

Additionally, defendants' motion to strike portions of Patricia and Passy-Muir's reply brief is granted.