Filed 8/6/21  Vision En Analisis Y Estrategia S.A. De C.V. v. Erwin Legal, P.C. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| VISIÓN EN ANÁLISIS Y ESTRATEGIA S.A. DE C.V. et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> ERWIN LEGAL, P.C., et al., <br><br> Defendants and Appellants. | G058265, G058367 and G058428 <br><br> (Super. Ct. No. 30-2014-00756302) <br><br> O P I N I O N |

Appeals from an order and judgment of the Superior Court of Orange County, Thomas A. Delaney, Judge.  Affirmed.

Cozen O'Connor, Matthew S. Steinberg and Amy B. Alderfer; Mayer Brown, Neil M. Soltman and C. Mitchell Hendy for Plaintiffs and Appellants.

Beitchman & Zekian, David P. Beitchman and Paul Tokar for Defendants and Appellants, Erwin Legal, P.C., Christopher R. Erwin and David Mickelson Insurance Services.

\*           \*           \*

Two foreign investment firms purchased an interest in a family trust that owned a $4 million universal life insurance policy, and they hired a life settlement broker to help them sell that interest. The broker, who also happened to be a lawyer, asked a business contact to help him gather information on the policy, and the business contact (who was also in the life insurance industry) did so.

This case arose because neither the broker nor his business contact advised the investment firms of an upcoming policy premium payment due date. As a result, the investment firms failed to pay the premium and unwittingly allowed the policy to lapse, losing their entire investment. Sometime later, but before the investment firms filed this lawsuit, the broker, his law firm, and his business contact each adopted for the first time document destruction policies; they thereafter deleted their e-mails and other files concerning their efforts to sell the life insurance policy.

The investment firms sued the broker, his law firm, and his business contact for breach of contract, breach of fiduciary duty, and related claims. After a lengthy trial, the jury awarded the investment firms nearly $3 million in compensatory damages and over $1 million in punitive damages. The trial court later struck the punitive damages award and entered a modified judgment for compensatory damages only. These cross appeals followed.

The parties' main contentions on appeal concern (1) the propriety of the trial court's jury instructions on spoliation of evidence,[1] (2) whether substantial evidence supports various aspects of the verdict, (3) an alleged inconsistency in the special verdict, and (4) whether the court erred in striking the punitive damages award. For the reasons below, we find no reversible error and affirm.

---

[1] Spoliation is the intentional destruction or significant alteration of evidence or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation. (*Reeves v. MV Transportation, Inc*. (2010) 186 Cal.App.4th 666, 681.)

## FACTS

In 2008, a life insurance company sold a $4 million universal life insurance policy to a family trust, insuring the life of an octogenarian. The following year, the policy's beneficiary sold his interest in the trust to a life settlement provider, which in turn sold the interest to Tranen Capital Alternative Investment Fund, Ltd. (Tranen).

In 2011, Tranen's chief analyst, Karl Andersen, offered to sell the policy to two small investment firms based in Mexico, plaintiffs Vision en Analisis y Estrategia, S.A. de C.V. and Capitaliza-T Sociedad de Responsabilidad Limitada de Capital Variable (collectively, Plaintiffs). The key terms of the proposed deal were these: Plaintiffs would pay Tranen $2.15 million for an interest in the policy; Plaintiffs would hold the policy for one year; if the insured died during that one-year period, Plaintiffs would receive the entire $4 million death benefit; if the insured did not die during that period, Tranen would either repurchase the policy for $2.85 million (giving Plaintiffs a $700,000 profit) or facilitate the sale of the policy to a third party.

Plaintiffs agreed to those terms and wired their payment in July 2011, before they had received any written agreement. A month later, Andersen sent them a one-page contract to memorialize the transaction. The contract contained various incorrect terms, however, such as the omission of one of the Plaintiffs. As a result, Plaintiffs did not sign the contract at that time. Tranen later executed a three-page assignment granting Plaintiffs all of its rights in the trust, including its rights in the policy; the assignment did not assign Plaintiffs an interest in the policy itself.

In May 2012, Andersen (who by this point had left Tranen) informed Plaintiffs that Tranen was having liquidity problems and might not repurchase the policy, but he had recruited a broker to sell their interest. He also informed them the next policy premium of $154,207 was due on July 2. Plaintiffs were surprised to learn that another premium was due.

About that same time, Andersen contacted defendant Christopher R. Erwin about possibly selling the policy for a commission payment. Erwin is a California attorney and a member of defendant Erwin Legal, PC (Erwin Legal), a law firm that represents clients in the life settlement industry. Erwin is also a licensed life settlement broker and conducts that business out of his law office, using his Erwin Legal e-mail account.

To broker the sale of the policy, Erwin needed to obtain information about the policy premiums and the insured's medical status so he could determine the policy's value. Neither Erwin nor Plaintiffs could obtain that information directly, as privacy rules prohibit the disclosure of such information to anyone other than the insured, the policy owner, the agent who sold the policy, and the servicing agent.

Erwin therefore reached out to his client and business contact, defendant David Mickelson Insurance Services (DMIS), which had been involved in underwriting and brokering the 2009 sale of the policy. Erwin asked whether DMIS, as a "favor," would track down policy-related information from the agent who had facilitated the trust's procurement of the policy. DMIS agreed to help Erwin without compensation; DMIS executive vice president Rochelle Werrett-Allen was tasked to assist Erwin.

Meanwhile, Plaintiffs' director of business and finance, Jose Juan Hernandez, asked Plaintiffs' attorney, Georgina Fabian, to determine whether the policy was in danger of lapsing and why another premium payment was due. Hernandez and Fabian contacted Andersen to discuss the policy; Andersen told them the contract and assignment from Tranen were sufficient proof that Plaintiffs owned the policy, but recommended calling Erwin to discuss matters further.

On June 5, 2012, at Plaintiffs' direction, Fabian telephoned Erwin to retain him as a broker and offer him a commission to sell the policy. What exactly Fabian and Erwin agreed to during that telephone call is disputed.

4

According to Fabian, she offered Erwin a commission for selling the policy and Erwin accepted; he said the assignment from Tranen was sufficient proof that Plaintiffs owned the policy; he told her to have Plaintiffs pay the premium that was coming due so the policy did not lapse; he said he had a "contact" who could provide information about the policy; he agreed to monitor and keep track of the policy, the premium payments, and the insured's health; and he expressed confidence that he could broker the transaction. According to Fabian, she hired Erwin in large part because of his expertise, because he was also an attorney, and because his contact could provide him with the necessary information on the policy.

Erwin recalls their June 5 conversation differently. According to Erwin, he told Fabian he would try to help Plaintiffs sell the policy only *if* Fabian was first able to clear the chain of title issues; he denied agreeing to monitor premium payments or ensure the premiums were paid.

Erwin did not ask Plaintiffs to sign a brokerage agreement, and Plaintiffs did not request one. However, Fabian e-mailed Erwin later that day on his Erwin Law e-mail account and asked him to confirm any recommendations he had related to brokering the policy. Erwin replied that Plaintiffs should pay the premium that was coming due, and then he would obtain more information from the insurer and work to "ensure a swift sale."

A week later, Fabian e-mailed Erwin to confirm Plaintiffs paid the premium and ask about what to do next. Erwin replied that he would keep her informed every step of the way. A week after that, Erwin advised Fabian that the insurer confirmed receipt of the premium and the "[s]ale is progressing smoothly."

Later that summer, Erwin and Fabian met in person to discuss matters further. Erwin assured Fabian he expected to receive the insured's medical records soon, after which the sale would move more quickly. He did not mention that another premium was be due later that year. Fabian reiterated that Plaintiffs would pay him a commission

5

for brokering the sale, and she did not want to receive any surprise hourly bills from Erwin Legal.

In the months that followed, Werrett-Allen, the DMIS employee assisting Erwin, "worked her tail off" to track down information about the policy, the insured's medical condition, the policy's cash value (which at some point became negative), and the policy's premium amounts and due dates (including the next due date of August 27). Mindful that "time was of the essence," Werrett-Allen promptly forwarded all that information to Erwin so he could try to sell the policy. By this point, no one from DMIS had ever spoken directly with Plaintiffs or Fabian, but both Werrett-Allen and DMIS's founder were aware that DMIS's work for Erwin was for the benefit of Plaintiffs and Fabian.

Despite receiving that policy-related information from Werrett-Allen, Erwin never informed Plaintiffs about any of it, including the premium payment due dates; nor did anyone from DMIS forward that information to Plaintiffs. As a result, Plaintiffs were unaware another premium payment was due on August 27; they therefore failed to pay that premium. Plaintiffs were similarly unaware their nonpayment triggered a 61-day grace period, and failure to pay by the end of that grace period would cause the policy to lapse. Plaintiffs did not pay the premium by the end of the grace period, and on October 27, the policy lapsed. Its entire $4 million value was then lost.

Meanwhile, Erwin continued his efforts to sell the policy, but reported to Fabian that the offers he received were not "acceptable."[2] He blamed this on "chain of title" issues (i.e., the fact Plaintiffs owned a beneficial interest in the trust rather than the policy itself), and he asked Fabian to have Plaintiffs prepare corporate resolutions so he could correct those problems with the insurer.

---

[2] Plaintiffs never gave Erwin authority to accept or reject offers for the policy.

6

Fabian did so and sent Erwin the corporate resolutions in early November. In mid-November, still unaware the policy had lapsed, Erwin told Fabian the trustee had agreed to transfer the policy into Plaintiffs' names, and he asked Plaintiffs to pay a $25,000 fee for the preparation of "closing contracts" to transfer title. Fabian perceived his request as "good news," believing the only task remaining to clear up title was the payment of that fee. She asked Erwin to send her payment information "ASAP" and to confirm Plaintiffs would hold the policy and be its rightful beneficiaries. In reply, Erwin confirmed, "Yes – the policy will be owned directly by your clients. I will request the contract today."

On November 16, Erwin advised Fabian he was leaving town on vacation. He then asked her to send the names of the contract signatories for the closing contracts directly to Werrett-Allen, whom he copied on this e-mail exchange. This was the first time Werrett-Allen was copied on any of the e-mails between Fabian and Erwin, and the first time Fabian had ever heard of Werrett-Allen by name. Fabian and Werrett-Allen exchanged several e-mails later that day. That was the only day anyone from DMIS communicated directly with Fabian.

On November 19, Fabian e-mailed Erwin to inquire about the closing contracts; Erwin did not respond. Fabian followed up with another e-mail on November 21; again, Erwin did not respond. Werrett-Allen learned of the policy's lapse on about November 20. She did not notify Fabian about it.

Erwin, who was on vacation in Mexico during this time, learned about the lapse when he returned to work on November 27. Upon hearing the news, he instructed Werrett-Allen to seek reinstatement, and she began that process. That same day, Erwin e-mailed Fabian that he was "informed by the writing agent that the policy lapsed." He did not tell Fabian why or mention the pending reinstatement request.

Upon receiving news of the lapse, Fabian was, in her words, "shocked" and "furious." She e-mailed Erwin, "What do you mean that the policy lapsed? We were still

7

good last week when [Werrett-Allen] was going to finalize the agreements that day – then I heard nothing for a week. How did this happen? My client is going to have a heart attack!" Fabian repeatedly asked Erwin for an explanation for the policy lapse, but Erwin did not provide one. Instead, he indicated he was still trying to get that information from the insurer.

Fabian and Erwin exchanged several e-mails in December about seeking reinstatement. Having received no explanation from Erwin about the lapse, Fabian assumed the insurer had misapplied Plaintiffs' June premium payment. She shared this notion with Erwin; he did not bother to correct her. Meanwhile, in an apparent attempt to distance himself from the situation, Erwin told Fabian he did "not represent [her] or [her] clients" and insisted he only reached out to the agent who sold the policy as a "courtesy [*sic*]."

It was not until January 2013 that Fabian learned the policy lapsed for nonpayment of the October premium. Fabian stopped communicating with Erwin at this point, having concluded she was "not going to get anywhere" with him.

In February 2013, Werrett-Allen learned the insurer had declined to reinstate the policy. Werrett-Allen notified Erwin about the declination, but neither she nor Erwin told Fabian about it. Soon thereafter, Erwin told Werrett-Allen to stop working on and providing information on the policy.

The insured octogenarian died in March 2013. After his death, the trust made a claim for policy benefits which the insurer denied because the policy had lapsed.

In November 2014, nearly two years after their last communication with Erwin, Plaintiffs filed a complaint against Erwin, Erwin Legal, and DMIS (collectively, Defendants). In their operative third amended complaint, Plaintiffs alleged claims for (1) breach of contract against Erwin and Erwin Legal (collectively, the Erwin Defendants), (2) breach of contract as an intended third-party beneficiary against DMIS, (3) breach of

8

fiduciary duty against the Erwin Defendants, (4) breach of fiduciary duty against DMIS, and (5) gross negligence against DMIS.[3]

The lawsuit allegedly came as a complete surprise to Defendants. Plaintiffs had not sent Defendants a litigation hold letter asking them to preserve their records or otherwise notify Defendants of their intent to file suit. According to Erwin, he had "zero thought or concern" of being sued, and according to DMIS's founder, a lawsuit was "inconceivable" and "unimaginable."

During discovery, Plaintiffs served numerous document requests on Defendants, seeking all communications and other documents regarding the policy, the parties' dealings, and the surrounding circumstances. Defendants did not produce a single document in response, asserting the requested documents either never existed, were destroyed, or were otherwise no longer in their possession.

It thereafter came to light that not long after their dealings with Plaintiffs, but before the filing of the complaint, both Defendants had adopted for the first time unwritten document destruction policies. In accordance with these policies, Defendants deleted all documents, including all e-mails, related to their work on the life insurance policy from 2012 and 2013; they were therefore unable to comply with any of Plaintiffs' document requests. As a result, Plaintiffs had to litigate their case without access to most of the written communications between Erwin and DMIS, and without access to the Erwin Defendants' or DMIS's internal communications and file materials.[4]

Defendants had different explanations for adopting their document destruction policies. According to DMIS, it implemented its first-ever policy on

---

[3] Plaintiffs also litigated various claims against the insurer and Andersen in other jurisdictions and eventually reached a settlement with them.

[4] The above description of Erwin's and DMIS's 2012 and 2013 communications comes largely from testimony at trial, not from e-mails or other documentary evidence.

document retention and destruction at the advice of counsel at some point in 2013, after completing its work for Erwin. Under DMIS's policy, all files and e-mails that were not "client files" were deleted when they were no longer needed, so as to protect against hacks of personal information. Client files, on the other hand, were to be saved for five years before deletion. DMIS did not consider its 2012 and 2013 work for Erwin to be part of a client file because it only performed that work as a "favor." DMIS's retention policy was never reduced to writing, and DMIS's founder admitted he "cannot even prove [it] exists."

According to Erwin, in summer 2014, he adopted an e-mail retention policy in which all e-mails more than 12 months old were automatically deleted on a rolling basis. He implemented that policy because he sometimes received medical records via e-mail, he wanted to comply with federal law concerning medical record privacy, and he was concerned about his e-mail being hacked. The policy was never reduced to writing. Although Erwin initially claimed the policy was "firmwide" at Erwin Legal, he later acknowledged he was the only person in the firm who had that policy; another attorney at Erwin Legal confirmed the firm itself had no such policy.

Plaintiffs filed a motion for terminating, issue, evidentiary, and monetary sanctions against Defendants based on their alleged spoliation of evidence. The trial court denied their motion without prejudice to its renewal at trial, citing *New Albertsons, Inc. v. Superior Court* (2008) 168 Cal.App.4th 1403, 1431 (*New Albertsons*) for the proposition that "'in most cases of purported spoliation the facts should be decided and any appropriate inference should be made by the trier of fact after a full hearing at trial.'" The court added this: "While there is evidence to support the inference that many documents are missing, Plaintiffs also have collected 3000 documents in discovery. All of the e-mail[s] between attorney Christopher Erwin and attorney Georgina Fabian have been retained. It is unclear at this time whether there are missing documents that would

10

affect the result of the litigation.  Therefore, the Motion is denied without prejudice to Plaintiffs raising the issues again."

Plaintiffs later filed a motion in limine asking the trial court to find that Defendants' willful destruction of evidence prejudiced Plaintiffs and to give a modified version of California Civil Jury Instruction (CACI) No. 204, the form instruction on willful suppression of evidence, at trial.  The Erwin Defendants filed a motion in limine to exclude all evidence of alleged document destruction.

At the hearing on these motions, Defendants requested an Evidence Code section 402 hearing so the trial court could determine whether Defendants anticipated the litigation.  The court denied the request, finding the matter had been previously explored, it was unlikely anything new would be unearthed at an Evidence Code section 402 hearing, and the question of whether Defendants willfully destroyed documents relevant to anticipated litigation should be left to the jury.

The trial court then granted Plaintiffs' motion in limine in part, and denied Defendants' motion in limine:  "There is no question that Defendants destroyed evidence. At a minimum, there is sufficient evidence for a jury to determine that Emails between the parties' representative[s] were destroyed.  The issues are at least three-fold: (1) whether any documents actually were lost . . . , (2) whether documents lost should have been retained based on the information Defendants had at the time they were destroyed, e.g., was litigation reasonably foreseeable to Defendants (a preservation letter may be proof of reasonable foreseeability, but it is not required); and (3) whether there is sufficient proof that any document destroyed was pertinent to the issues in this case, e.g., whether Plaintiffs were prejudiced by the loss of documentation.  [¶]  Therefore, the motion to admit evidence of document destruction and retention policy is GRANTED."

Consistent with that ruling, trial counsel for all parties discussed Defendants' destruction of documents and their document retention policies in their opening statements, and the jury heard testimony related to those matters.  Additionally,

11

over Erwin's objections, the trial court gave jury instructions, which we discuss below, about inferences the jury could draw from a party's willful destruction of evidence.

After a 16-day trial involving 11 witnesses and over 120 exhibits, the jury returned a special verdict for Plaintiffs on the breach of contract claim against the Erwin Defendants, on the breach of fiduciary duty claims against the Erwin Defendants, on the breach of fiduciary claim against DMIS (which the jury found was the Erwin Defendants' subagent), and on the negligence claim against DMIS. The jury found for DMIS and against Plaintiffs on their claim for breach of contract as an intended third party beneficiary, concluding that although Erwin and DMIS formed a contract for the benefit of Plaintiffs, DMIS did not breach that contract.

The jury then awarded Plaintiffs compensatory damages of $2,940,927 against all Defendants, jointly and severally. It also found Plaintiffs proved by clear and convincing evidence that all three Defendants acted with malice, oppression, or fraud, and awarded punitive damages of $500,000 against Erwin, $750,000 against Erwin Legal, and $100,000 against DMIS. The trial court entered a judgment in accordance with the jury's special verdict.

Defendants moved for judgment notwithstanding the verdict (JNOV), asserting the evidence at trial was insufficient to support the verdict. The trial court largely denied their motions, but it did strike all the punitive damage awards. The court then entered a modified judgment, which included the compensatory damages awards but excluded any punitive damage award.

Defendants filed notices of appeal from the judgment, order denying their JNOV motions, and the modified judgment. Plaintiffs filed a notice of cross-appeal from the modified judgment striking the punitive damage awards. We consolidated the appeals.

12

1.      *The Jury Instructions*

Defendants devote most of their briefing to challenging the trial court's jury instructions on willful destruction of evidence.  "We review de novo whether a jury instruction correctly states the law."  (*People v. Lopez* (2011) 198 Cal.App.4th 698, 708.)  After reviewing the challenged instructions de novo, we find no error.

California has long recognized "the evidentiary inference that evidence which one party has destroyed or rendered unavailable was unfavorable to that party.  This evidentiary inference, currently set forth in Evidence Code section 413 and in the standard civil jury instructions, has a long common law history" dating back to at least 1722.  (*Cedars-Sinai Medical Center v. Superior Court* (1998) 18 Cal.4th 1, 11 (*Cedars-Sinai*); see Evid. Code, § 413 ["In determining what inferences to draw from the evidence or facts in the case against a party, the trier of fact may consider, among other things, the party's . . . willful suppression of evidence . . ."].)

This inference is but one of a "number of nontort remedies that seek to punish and deter the intentional spoliation of evidence."  (*Cedars-Sinai, supra,* 18 Cal.4th at p. 11.)  Such conduct is condemned because it "can destroy fairness and justice, for it increases the risk of an erroneous decision on the merits of the underlying cause of action.  Destroying evidence can also increase the costs of litigation as parties attempt to reconstruct the destroyed evidence or to develop other evidence, which may be less accessible, less persuasive, or both."  (*Id.* at p. 8.)

Consistent with these authorities is CACI No. 204:  "You may consider whether one party intentionally concealed or destroyed evidence.  If you decide that a party did so, you may decide that the evidence would have been unfavorable to that party."  (CACI No. 204.)  Trial courts are not bound by this language, however, and "are free to adapt it to fit the circumstances of the case, including the egregiousness of the

13

spoliation and the strength and nature of the inference arising from the spoliation." (See *Cedars-Sinai, supra,* 18 Cal.4th at p. 12.)

The trial court in this case gave CACI No. 204, unmodified, to the jury. It then gave the jury a special instruction on the spoliation of evidence: "If you find that Defendants consciously destroyed relevant evidence when litigation was reasonably foreseeable, you may infer that the evidence destroyed by the Defendants was favorable to Plaintiffs and adverse to Defendants. Whether or not litigation is foreseeable considers objective standards and does not depend on what the individual party thinks. Litigation is foreseeable if a reasonable person, in a similar circumstance to the Defendants, could have plausibly contemplated litigation. You may consider whether a litigation hold letter was sent formally advising an individual or entity to maintain documents, but a litigation hold letter is not required for determination that litigation is reasonably foreseeable."

In issuing the special instruction, the trial court seemingly borrowed from the federal standard related to a party's duty to preserve evidence. Under that standard, the "duty to preserve evidence begins when litigation is 'pending or reasonably foreseeable,'" which "is an objective standard, asking not whether the party in fact reasonably foresaw litigation, but whether a reasonable party in the same factual circumstances would have reasonably foreseen litigation." (*Micron Technology, Inc. v. Rambus Inc*. (Fed.Cir. 2011) 645 F.3d 1311, 1320; see *Silvestri v. General Motors Corp*. (4th Cir. 2001) 271 F.3d 583, 591 [party must preserve evidence even "before the litigation when [it] reasonably should know that the evidence may be relevant to anticipated litigation"]; *Bistrian v. Levi* (E.D. Pa. 2020) 448 F.Supp.3d 454, 468 ["This common-law standard is an objective one" necessitating a "fact-sensitive inquiry"]; *Apple Inc. v. Samsung Electronics Co., Ltd.* (N.D.Cal. 2012) 881 F.Supp.2d 1132, 1145 (*Apple*) ["The phrase 'reasonably foreseeable' as it relates to a party's preservation duties sets an objective standard."]; *In re Napster, Inc. Copyright Litig.* (N.D.Cal. 2006) 462 F.Supp.2d 1060, 1068 [litigation need not be imminent to trigger duty to preserve; test is whether

14

party "'should have known that the evidence may be relevant to future litigation'"]; see also Fed. Rules Civ. Proc., 37(e)(2) & Committee Notes on 2015 Amendment.)

Defendants assert that giving CACI No. 204 was unwarranted here because there was no evidence they *willfully* suppressed evidence for the improper purpose of preventing its use in litigation. We disagree. Defendants conceded in discovery and at trial that they deleted their e-mails and other records shortly after the events in question occurred but before they were sued. And despite the lack of direct evidence that Defendants deleted that evidence to prevent its use in future litigation, there was substantial circumstantial evidence from which the jury could have inferred intent. (See *People v. Canizales* (2019) 7 Cal.5th 591, 602 [direct evidence of intent is rare, so intent may be inferred from circumstances and from defendant's statements and conduct].) For example, Erwin took steps to distance himself from the situation after being informed the policy lapse would give Plaintiffs a "heart attack"; both Defendants adopted document retention policies for the first time just months after the loss of Plaintiffs' $4 million investment; and Defendants never reduced those alleged document retention policies to writing.

Given this record, the jury was properly tasked with deciding whether the destruction was willful or for an improper purpose, and if so, whether to draw an adverse inference. (See *New Albertsons, supra,* 168 Cal.App.4th at p. 1434 ["the jury may consider all relevant and admissible evidence in determining whether evidence was willfully suppressed"].)

Defendants also take issue with the trial court's special instruction, asserting California has not adopted an objective standard for measuring the likelihood of future litigation, and Defendants' subjective beliefs about the likelihood of litigation should have been taken into account. We are not persuaded. To our knowledge, no California court has expressly adopted the reasonable foreseeability test, or otherwise approved a special jury instruction similar to that given here. But Defendants here

15

conceded in their briefing and during oral argument they had a duty to preserve their records if litigation was "reasonably foreseeable." Whether litigation is "reasonably foreseeable" is necessarily an objective question. The test is not whether litigation was "actually foreseen," which would suggest a subjective test — and for good reason. If courts were to apply a subjective test, a party could destroy its records before a lawsuit is filed against it and yet potentially avoid an adverse evidentiary inference by claiming it subjectively did not foresee any litigation at the time of the destruction. Defendants cite no California authority adopting a subjective test in this context. The special instruction employing an objective reasonable foreseeability standard was proper.

Defendants argue the trial court erred by refusing to conduct an Evidence Code section 402 hearing before trial to determine whether Defendants had a duty, as a matter of law, to preserve their e-mails. We disagree. As noted, the relevant test is not one of legal duty per se; the issue is whether Defendants destroyed evidence when litigation was "reasonably foreseeable." That is a factual question; it was appropriately decided "by the trier of fact after a full hearing at trial." (*New Albertsons, supra,* 168 Cal.App.4th at p. 1431; see CACI 204.)

Defendants also contend the instructions were improper because they were complying with their newly adopted document retention policies when they destroyed their e-mails and other records. Again we must disagree. "Once a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and . . . ensure the preservation of relevant documents." (*Zubulake v. UBS Warburg LLC* (S.D.N.Y. 2003) 220 F.R.D. 212, 218; see *Apple, supra*, 881 F.Supp.2d at pp. 1146-1147 [adverse inference instruction was appropriate where defendant kept its biweekly auto-delete e-mail policy in place even though litigation was reasonably foreseeable]; Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2021) ¶ 8:19.21, p. 8A-13 [if "litigation appears likely," counsel should "advise the client to suspend its data deletion policies regarding any data that is potentially relevant to the

16

matter"].)  It was proper for the trial court to allow the jury to make an adverse inference against Defendants if the jury found litigation was reasonably foreseeable and Defendants failed to prevent the destruction of relevant documents.

Defendants likewise insist they were under no obligation to preserve documents because Plaintiffs never sent them a litigation hold letter.  No so.  Whether an opponent sent a litigation hold letter is relevant in determining whether litigation was reasonably foreseeable,[5] but the *absence* of such a letter is not dispositive on the issue. Allowing a party to escape an adverse inference instruction based solely on the lack of a litigation hold letter might encourage parties to delete evidence early on before they receive a litigation hold letter without consequence; it would also potentially penalize unsavvy or unrepresented parties who fail to send a litigation hold letter immediately. The trial court was correct when it permitted the jury to "consider whether a litigation hold letter was sent formally advising an individual or entity to maintain documents," but added "a litigation hold letter is not required for a determination that [a] litigation is reasonably foreseeable."

Finally, Defendants suggest the jury instructions were improper because Plaintiffs had possession of and introduced into evidence certain e-mails between Fabian and Erwin, as well as certain e-mails Plaintiffs obtained from Andersen and Werrett-Allen.  Defendants therefore contend Plaintiffs were not prejudiced by Defendants' deletion of their e-mails and other file materials.  This argument strikes us as nearly frivolous.  The availability of certain documents does not excuse the spoliation of others. Defendants' deletion of e-mails and file materials prevented Plaintiffs from discovering

---

[5]     See *In re Ethicon, Inc. Pelvic Repair Systems Product Liability Litig.* (S.D.W.Va. 2014) 299 F.R.D. 502, 512 ["the receipt of a demand letter, a request for evidence preservation, a threat of litigation, or a decision to pursue a claim will all trigger the duty to preserve evidence"].

and introducing Defendants' internal files, as well as e-mail communications between DMIS and Erwin. An adverse inference instruction was warranted.

For all these reasons, we conclude the challenged jury instructions were correct and appropriate. Because we find no instructional error, we need not reach Defendants' additional argument that the instructions were unfairly prejudicial. The jury was not required to make an adverse inference; they were instead given a permissive instruction which allowed them to determine whether Defendants intentionally destroyed evidence, and if so, whether to infer the suppressed evidence was unfavorable to Defendants. On this record, we see no error.

2.      *Opening Statements*

DMIS contends the trial court erred in allowing Plaintiffs' counsel to address the spoliation issue in his opening statement. Again, we are not persuaded. Defendants were aware after the courts in limine ruling Plaintiffs' counsel planned to address spoliation in his opening statement, yet they failed to contemporaneously object, thereby waiving the argument. (*Brokopp v. Ford Motor Co*. (1977) 71 Cal.App.3d 841, 860.) And in any event, Defendants' counsel immediately responded to the issue in their own opening statements, thereby eliminating any potential for prejudice.

3.      *The Special Verdict*

DMIS also contends the special verdict is inconsistent because the jury's findings on the second and fourth causes of action are irreconcilable. As noted, Plaintiffs' second cause of action against DMIS was for breach of contract as an intended third party beneficiary, while its fourth cause of action against DMIS was for breach of fiduciary duty. The jury found for Plaintiffs on the breach of fiduciary duty claim, but they found for DMIS on the contract claim, concluding that although Erwin and DMIS formed a contract for the benefit of Plaintiffs, DMIS did not breach that contract.

DMIS contends these two results are fatally inconsistent, thus requiring reversal. According to DMIS, the conduct underlying both the contract cause of action

18

and the fiduciary duty cause of action is one and the same: DMIS's alleged failure to keep Plaintiffs informed of pertinent information about the policy so as to avoid a lapse and to facilitate its sale. Thus, asserts DMIS, the jury's findings that DMIS breached its fiduciary duties but not the contract are irreconcilable.[6]

"[W]e review a special verdict de novo to determine whether its findings are inconsistent." (*Singh v. Southland Stone, U.S.A., Inc.* (2010) 186 Cal.App.4th 338, 358.) "A special verdict is inconsistent if there is no possibility of reconciling its findings with each other." (*Id.* at p. 357.) If the jury's findings are contradictory on material issues, and the correct determination of those issues is necessary to sustain the judgment, the inconsistency is reversible error, and the proper remedy is a new trial. (*See, e.g., id.* at pp. 358-359 [jury's finding that defendant intentionally misrepresented a material fact was inconsistent with its finding that defendant made no false misrepresentation].)

Although DMIS's inconsistent verdict argument has some visceral appeal, it conflates the contractual duties arising under DMIS's contract with Erwin for Plaintiffs' benefit, on the one hand, and the fiduciary duties DMIS owed to Plaintiffs as Erwin's subagent, on the other. The jury heard testimony that DMIS communicated to Erwin all policy-related information, and thus could have concluded DMIS did not breach its contractual obligation to gather and forward information on the policy. The jury also heard testimony that DMIS knew it was working for the benefit of Plaintiffs and Fabian, yet made no effort to ensure they received that information. Based on this evidence, the jury reasonably could have concluded DMIS's communications with Erwin satisfied its contractual obligations to Erwin, but DMIS's failure to communicate that

---

    [6] Plaintiffs assert DMIS waived this argument by failing to raise the claimed inconsistency before the jury's dismissal. Not so. Although "[a] party who fails to object to a special verdict form ordinarily waives any objection to the form," no "objection [is] required when the verdict is fatally inconsistent." (*Behr v. Redmond* (2011) 193 Cal.App.4th 517, 530.)

19

information to Fabian was a breach of its fiduciary duties to Plaintiffs. Since these two findings are reconcilable, we see no fatal inconsistency in the special verdict.

4.      *Substantial Evidence Supports the Verdict*

Defendants next challenge certain portions of the verdict for lack of substantial evidence. In evaluating a claim of insufficiency of evidence, we consider whether the record contains "evidence that is 'of ponderable legal significance,' 'reasonable in nature, credible, and of solid value.'" (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1006.) We "must resolve all conflicts in the evidence in favor of the prevailing party and must draw all reasonable inferences in support of the trial court's judgment." (*Leung v. Verdugo Hills Hospital* (2012) 55 Cal.4th 291, 308.)

a.      *Erwin Legal*

The Erwin Defendants argue there was insufficient evidence to support Plaintiffs' claims against Erwin Legal, as distinguished from Erwin the individual. After evaluating the evidence as a whole, we disagree.

Erwin Legal represents clients in the life settlement industry; Erwin operates his life settlement brokerage business out of Erwin Legal; he used his Erwin Legal e-mail account to conduct that business and in his dealings with Plaintiffs, Fabian, and DMIS; he signed his e-mails to Fabian as "Christopher R. Erwin, Esq., ERWIN LEGAL, PC"; and it was Erwin Legal's "firm-wide" document destruction policy that resulted in the deletion of his records and e-mails from those dealings. The record is devoid of any evidence which indicated Erwin took steps to distinguish his actions as a broker from those of his firm. Fabian did testify she hired Erwin as a broker, not as a lawyer. But resolving all evidentiary conflicts in favor of Plaintiffs and drawing all reasonable inferences in support of the judgment, as we must, we conclude substantial evidence supports the jury's liability findings against both Erwin *and* Erwin Legal.

b.      *DMIS's Negligence*

DMIS contends there was insufficient evidence to support the judgment on the negligence cause of action. To support this claim, Plaintiffs argued DMIS was aware at all relevant times that its work for Erwin was for the benefit of Plaintiffs and Fabian, DMIS therefore had a duty to convey policy-related information to Plaintiffs directly, and it breached that duty by failing to notify Plaintiffs of the premium due date. DMIS contends this theory fails because DMIS had no direct communications with Fabian until November 16, several weeks after the policy lapsed, and because there is no evidence in the record demonstrating DMIS knew Fabian's contact information before November 16.

Again, we cannot agree. Both Werrett-Allen and DMIS's founder testified they were aware as early as June 2012 that DMIS's work for Erwin was for the benefit of Plaintiffs and Fabian. Although there is no evidence in the record affirmatively demonstrating DMIS had Fabian's contact information before November 16, the jury reasonably could have inferred under Evidence Code section 413 the missing e-mails between DMIS and Erwin would have demonstrated DMIS had access to Fabian's contact information before the policy lapsed in October.

c.      *DMIS's Breach of Fiduciary Duty*

DMIS contends there was insufficient evidence that DMIS breached its fiduciary duty to Plaintiffs. Again, we disagree. The jury unanimously found DMIS was the Erwin Defendants' authorized subagent. Therefore, DMIS owed Plaintiffs the same fiduciary duties as the Erwin Defendants. (*Mendoza v. Continental Sales Co*. (2006) 140 Cal.App.4th 1395, 1403-1404; Civ. Code, § 2351 ["A sub-agent, lawfully appointed, represents the principal in like manner with the original agent"]; 2 Witkin, Summary of Cal. Law, (11th ed. 2017) Agency and Employment, § 127, p. 180.) One such duty was to tell the principal (i.e., Plaintiffs) "all information it possesses that is material to the principal's interests." (*Michel v. Moore & Associates, Inc*. (2007) 156 Cal.App.4th 756, 762.) DMIS did not do so.

21

DMIS maintains these authorities are superseded by various Insurance Code provisions, which state a life settlement broker exclusively represents the policy's owner and owes a fiduciary duty to that owner to act in his or her best interests. (Ins. Code, §§ 10113.1, subd. (b), 10113.2, subd. (d)(13).) Since Plaintiffs technically own the policy, but only an interest in the trust, DMIS contends it owed them no fiduciary duty. We disagree. Nothing in the cited code sections impliedly or expressly eliminates a life settlement broker's common law fiduciary obligations. Nor do the cited code sections state that a life settlement broker can never owe a fiduciary duty to someone other than the policy's owner.

DMIS alternatively contends that even if traditional agency principles apply, there is no evidence DMIS was an authorized subagent, and as an unauthorized subagent, DMIS owed no duties to Plaintiffs. (See Civ. Code, § 2022 ["A mere agent of an agent is not responsible as such to the principal of the latter"]; *id.*, § 2350 [principal has "no connection" with its agent's unauthorized subagent].) But Fabian testified that when she hired Erwin to sell the policy, he told her he had a "contact" (i.e., DMIS) that could track down information on the policy; indeed, that contact was one of the main reasons Fabian and Plaintiffs hired Erwin. This constitutes substantial evidence that DMIS was Erwin's authorized subagent. (See Civ. Code, § 2349, subd. (4) [agent can delegate his powers to another person when principal specially authorizes it].)

DMIS further contends that even if it was Erwin's subagent, it was not responsible to Plaintiffs because it did not know of Plaintiffs' existence and did not have their contact information until November 16, 2012, after the lapse. Not so. DMIS admitted it was aware from the get-go that its work was for the benefit of Plaintiffs and Fabian. And although DMIS had no direct contact with Fabian until November 16, the jury could have reasonably inferred that the e-mails DMIS deleted would have demonstrated DMIS had access to Fabian's contact information before the policy lapsed. Resolving all evidentiary conflicts in favor of Plaintiffs and drawing all reasonable

22

inferences in support of the judgment, again as we must, we conclude substantial evidence supports the jury's conclusion that DMIS, as the Erwin Defendants' subagent, breached its fiduciary duties to Plaintiffs.

5.      *Punitive Damages*

Finally turn to Plaintiffs' cross-appeal, which concerns the trial court's decision to strike the punitive damages award.  Before addressing Plaintiffs' arguments, however, we summarize the relevant proceedings.

Before the close of evidence, Defendants moved for nonsuit and asked the trial court to strike Plaintiffs' punitive damages demand.  The court granted the motion in part and denied it in part; it found there was sufficient evidence to support Plaintiffs' punitive damages demand based on Defendants' alleged willful destruction of evidence, but insufficient evidence to support Plaintiffs' punitive damages demand based on Defendants' alleged "double-dealing" of the policy in violation of their fiduciary obligations.  Accordingly, the court ruled that "the only mechanism for Plaintiffs to get punitives is the willful destruction of evidence and the spoliation issue."  The court did not allow Plaintiffs to pursue punitive damages on any other theory.

Consistent with that ruling, Plaintiffs' counsel told the jury in his closing argument that "[p]unitive damages are extra damages that you are entitled to award [Plaintiffs] later on if you conclude by clear and convincing evidence that [Defendants] acted with oppression, fraud, or malice in their despicable document destruction in this case."  Counsel then explained to the jury "why [Plaintiffs] are also entitled to punitive damages for spoliation. . . . Spoliation of evidence is a perversion of justice.  It is a miscarriage of justice.  It is committed by people who are despicable by their very nature and have no regard for our justice system. . . . Spoliation is cheating at the highest levels of justice.  It is an act of consummate disrespect for our justice system, for our judges, and for our juries. . . . You should send a signal to these Defendants that it is intolerable to this jury and this case.  You should find for punitive damages."

23

Evidently persuaded, the jury found Plaintiffs proved "by clear and convincing evidence" that all three Defendants acted with malice, oppression, or fraud against Plaintiffs, and awarded punitive damages to Plaintiffs of $500,000 against Erwin, $750,000 against Erwin Legal, and $100,000 against DMIS. Its special verdict form did not specify the factual basis for these findings.

The trial court initially entered a judgment in accordance with the jury's special verdict. However, it later struck the punitive damages award when ruling on Defendants' JNOV motions and entered a modified judgment that excluded any punitive damages. In striking the punitive damages award, the court reasoned "Plaintiffs in this case were allowed to proceed on a claim for punitive damages based solely on a claim of willful destruction or spoliation of evidence," but "California law does not allow a punitive damage award based on solely on a claim of the willful destruction or spoliation of evidence." To support this conclusion, the court relied largely on *Cedars-Sinai, supra,* 18 Cal.4th 1, in which our Supreme Court held that "there is no tort remedy for the intentional spoliation of evidence by a party to the cause of action to which the spoliated evidence is relevant." (*Id.* at p. 17.)

Plaintiffs contend the trial court erred in its application of *Cedars-Sinai*. After considering this legal issue de novo, we disagree. In *Cedars-Sinai*, our Supreme Court unambiguously held there is "no tort remedy" for a fellow litigant's intentional destruction of evidence. It logically follows that a party may not recover damages (compensatory, punitive, or otherwise) from a fellow litigant for its intentional destruction of evidence. (See *Shaw v. Hughes Aircraft Co.* (2000) 83 Cal.App.4th 1336, 1348-1349 [retroactively applying *Cedars-Sinai* and reversing punitive damages award for spoliation]; *Penn v. Prestige Stations, Inc.* (2000) 83 Cal.App.4th 336, 339 [retroactively applying *Cedars-Sinai* and vacating punitive damages award "[b]ecause, aside from the spoliation of evidence, there was no other basis upon which to award punitive damages"].) Our focus is on whether Plaintiffs were awarded punitive damages

24

based on Defendants' spoliation of evidence.  The record is clear that is what occurred below;  the award was not permissible under *Cedars-Sinai.*

Plaintiffs alternatively insist that, independent of the spoliation theory, they are entitled to punitive damages for Defendants' breach of fiduciary duty.  Plaintiffs are correct that punitive damages may be awarded for breach of fiduciary duty if the defendant acted with malice, oppression, or fraud.  (See, e.g., *Cleveland v. Johnson* (2012) 209 Cal.App.4th 1315, 1345.)  They did not present that theory to the jury as a basis for awarding punitive damages, however, and we decline to speculate about whether the jury would have awarded punitive damages on that theory had it been presented at trial.  The only theory Plaintiffs presented for awarding punitive damages was Defendants' spoliation of evidence; Plaintiffs cannot pursue a new theory of recovery on appeal.  (*Richmond v. Dart Industries, Inc.* (1987) 196 Cal.App.3d 869, 874.)

Finally, Plaintiffs contend punitive damages are warranted because the jury could have inferred that the e-mails and other records destroyed by Defendants contained evidence demonstrating Defendants acted with oppression, malice, or fraud.  We disagree.  A punitive damages award must be supported "*by clear and convincing evidence* that the defendant has been guilty of oppression, fraud, or malice."  (Civ. Code, § 3294, subd. (a), italics added.)  Under the clear and convincing standard, the evidence must be so clear that it leaves no substantial doubt, and sufficiently strong to command the unhesitating assent of every reasonable mind.  (*Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc*. (2000) 78 Cal.App.4th 847, 891.)  A purely permissive adverse evidentiary inference does not rise to that level.

**DISPOSITION**

The order on Defendants' JNOV motions and the modified judgment are affirmed.  In the interest of justice, each party is to bear his or its own costs on appeal. (Cal. Rules of Court, rule 8.278(a)(5).)


GOETHALS, J.

WE CONCUR:


O'LEARY, P. J.


THOMPSON, J.